648 A.2d 978

**STATE of Maryland**

v.

**Roland MAZZONE.**

**No. 6, Sept. Term, 1994.**

Court of Appeals of Maryland.

Oct. 24, 1994.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for petitioner.

Russell J. White, Towson, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case concerns whether the Maryland Wiretapping and Electronic Surveillance Act, codified as Maryland Code (1973, 1989 Repl.Vol.) §§ 10–401 to 10–414 of the Courts and Judicial Proceedings Article, allows law enforcement agents to pur-

posefully intercept privileged marital communications.[1]   In addition, we consider whether all of the evidence obtained pursuant to a wiretap order must be suppressed. because minimization guidelines accompanying the order contained a misstatement of law concerning the scope of the marital communications privilege.

## I

### A

In 1968, Congress established minimum standards governing the interception of wire, oral, and electronic communications (known as Title III of the Omnibus Crime Control and Safe Streets Act).  18 U.S.C. §§ 2510–2521 (1988).  The Federal act sought to balance two major purposes:  1) to protect the privacy of individuals as required by the Fourth Amendment[2], and 2) to aid in the enforcement of the criminal laws. *United States v. Kahn,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *Mustafa v. State,* 323 Md. 65, 69, 591 A.2d 481 (1991); *Ricks v. State,* 312 Md. 11, 13, 537 A.2d 612, *cert. denied,* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988).

Pursuant to Title III, the Maryland legislature enacted the Wiretapping and Electronic Surveillance Act.  §§ 10–401 to 10–414.  The Maryland statute closely tracks the federal statute, being more restrictive than the federal statute in only a few provisions.

Under the statute, certain law enforcement officials may apply to a circuit court judge for an *ex parte* order authorizing a wiretap.  §§ 10–406, 10–408.  The judge may grant the

---

**1.**  All references to code sections are to the Maryland Code (1973, 1989 Repl.Vol.), Courts and Judicial Proceedings Article, unless otherwise indicated.

**2.**  The act was designed to meet the Fourth Amendment scrutiny which had been applied to wiretapping by the United States Supreme Court in *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

wiretap order "when the interception may provide or has provided evidence of the commission of [certain designated crimes]." § 10–406. The wiretap order must include, among other things, "[a] particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." § 10–408(d)(1)(iii). Wiretapping without a valid order is illegal, § 10–402, and evidence derived therefrom is inadmissible in court. § 10–405.

For the purpose of evaluating the validity of a wiretap order, this Court has established a dichotomy between preconditions and post conditions. *State v. Bailey,* 289 Md. 143, 152–54, 422 A.2d 1021 (1980). Preconditions include the actions that must be taken before a judge may issue an *ex parte* wiretap order and the inclusion of certain provisions required to be in the wiretap order. *Id.* at 153–54, 422 A.2d 1021. One such precondition is the requirement in § 10–408(e)(3) that "[e]very order and extension thereof shall contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this subtitle...." *See State v. Siegel,* 266 Md. 256, 273–74, 292 A.2d 86 (1972) (holding this requirement to be a precondition to obtaining intercept authority). With regard to preconditions, we said that the statute "sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path." *Id.* at 274, 292 A.2d 86 (emphasis in original). Failure of a precondition requires suppression of *all* the evidence obtained under the wiretap. *Id. See also* § 10–408(i)(1)(ii) (stating as a ground for suppression that "[t]he order of authorization under which [the communication] was intercepted ... was not obtained or issued in *strict compliance* with [the wiretapping statute]") (emphasis added).

Post conditions are the actions that must be taken after a valid wiretap order has been issued, including compliance with the minimization mandate in the order. *Bailey, supra,* 289 Md. at 153–54, 422 A.2d 1021. To post conditions, we apply a

substantial compliance standard. *Id.* In the context of minimization, the substantial compliance standard is actually a reasonable compliance standard, which evaluates "the overall reasonableness of the totality of the conduct of the monitoring agents in light of the purpose of the wiretap and the information available to the agents at the time of interception." *Spease and Ross v. State*, 275 Md. 88, 99, 338 A.2d. 284 (1975). Under this standard, imperfect compliance with a post condition does not require suppression of the evidence obtained pursuant to the wiretap order, so long as the level of compliance is reasonable under the circumstances. Furthermore, we have never decided what sanction we would apply if the monitoring agents were to fail to reasonably comply with the minimization mandate.

## B

The marital communications privilege is codified at § 9–105. It provides that "[o]ne spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage." We have observed that "[c]ommunications between husband and wife occurring during the marriage are deemed confidential if expressly made so, or if the subject is such that the communicating spouse would probably desire that the matter be kept secret, either because its disclosure would be embarrassing or for some other reason." *Coleman v. State*, 281 Md. 538, 542, 380 A.2d 49 (1977). *See also State v. Enriquez*, 327 Md. 365, 372, 609 A.2d 343 (1992) (quoting *Coleman* ). A spouse claiming the privilege need not "establish the confidential nature of the communication, as there is a rebuttable presumption that marital communications are confidential and privileged." *Enriquez, supra*, 327 Md. at 372, 609 A.2d 343; *see also Coleman, supra*, 281 Md. at 543, 380 A.2d 49. This presumption can be rebutted by a showing "that the communication was not intended to be confidential, or was made to, or in the presence of a third party." *Id.* at 543, 380 A.2d 49. In Maryland, the marital communications privilege applies even when the communication is made in furtherance of a crime. *Id.* at 545, 380 A.2d 49.

In *Coleman,* we recognized that the policy reasons underlying the privilege are

"(1) that the communications originate in confidence, (2) the confidence is essential to the relation, (3) the relation is a proper object of encouragement by the law, and (4) the injury that would inure to it by the disclosure is probably greater than the benefit that would result in the judicial investigation of truth."

*Id.* at 541, 380 A.2d 49. We also stated: "The essence of the privilege is to protect confidences only, and thereby encourage such communications free from fear of compulsory disclosure, thus promoting marital harmony." *Id.* (citations omitted).

## II

Beginning in 1989, the Harford County Narcotics Task Force and Baltimore County authorities jointly investigated the activities of Carl Briscoe for suspected cocaine distribution. In the course of the investigation the task force began to suspect that respondent Roland Mazzone, who lived in Baltimore County, was involved in the distribution ring.[3] On June 19, 1991, the State's Attorney for Baltimore County filed with the Circuit Court for Baltimore County *ex parte* applications to intercept and record conversations to and from two telephones (one at Mazzone's home, the other at his business, Valley View Inn) from June 20 to July 20, 1991. A circuit court judge approved the applications and, on June 19, signed orders authorizing the interceptions. The orders authorized the wiretaps, setting forth certain conditions, including a statement in the orders that the interceptions be conducted "in such a way as to minimize the interception of communications not otherwise subject to interception under Title 18, United States Code, Section 2510–2520, and the Courts and Judicial Proceedings Article, Section 10–401 through 10–414, of the Annotated Code of Maryland."

---

**3.** At trial, police investigators testified to telephone conversations between Mazzone and Briscoe, intercepted during a wiretap of Briscoe's telephones, which identified Mazzone as Briscoe's supplier.

At the time the orders were signed, the court also approved written minimization guidelines, formulated by the State's Attorney, which were to apply to the interceptions. The guidelines included a section on privileged communications, stating, in relevant part:

"Under Maryland Law, we will be concerned with privileged communications involving lawyer-client, husband-wife, priest-penitent, accountant-client and psychiatrist/psychologist-patient relationship. Contact the above listed Assistant State's Attorney's [sic] for Baltimore County for instructions if you anticipate that you are about to monitor such a conversation and cannot affirmatively decide to minimize it completely. If it appears that the communication does discuss the commission of a designated crime itself, the privilege is breached and the whole conversation is to be monitored. If it appears that the communication might discuss the commission of a designated crime then spot monitoring shall be employed. If the communication does not involve the commission of a crime then the privilege applies absolutely and must be completely minimized as soon as the speakers identify themselves.

"All husband and wife communications are privileged; but discussions which involve the commission of the designated crime may be intercepted. All other communications must be minimized and spot monitoring must be employed carefully."

On July 12, 1991, pursuant to further *ex parte* applications by the State's Attorney, the court terminated the interceptions authorized by the June 19 order and issued new orders, which authorized continuing the interceptions on the two telephones that were the subject of the June 19 order and initiating interceptions on two additional telephones at Mazzone's business. The court approved a new set of written minimization guidelines, prepared by the State's Attorney, which stated that the minimization guidelines approved on June 19 "will also apply to the operational procedures" authorized on July 12, except that "the following changes will be incorporated." The new guidelines stated, in relevant part:

"Information gathered from the wiretaps conducted over Roland Mazzone's residence telephone as well as the business telephone of the Valley View Inn has identified Mazzone's wife, Elizabeth Ann, as being involved in this illegal controlled dangerous substance operation. Thus the privilege that is afforded to them under Maryland Law as husband and wife is breached during the interception of conversations that pertain to Mazzone's illegal drug activity.

"All other instructions found under this subheading in the attached Minimization Guidelines dated June 19, 1991, will be followed during the intercept of the telephone lines identified herein."

During the investigation, the investigating officers learned that David Vita was Mazzone's supplier. Specifically, the officers collected evidence that on June 30, 1991, Mazzone paid Vita $14,000 and received from Vita a kilo (2.2 pounds) of cocaine.

Before trial, Mazzone moved to suppress all communications intercepted pursuant to the wiretap orders. He argued that the wiretap orders were illegal because the minimization guidelines misstated Maryland law with regard to the marital communication privilege and therefore illegally authorized interception of privileged communications. The trial court denied Mazzone's motion to suppress, and admitted into evidence the contents of the intercepted conversations, including two conversations between Mazzone and his wife. In the first conversation, Mazzone called his wife and she told him that he should not "come home empty-handed," meaning that he should bring some cocaine home with him. In the second conversation, Mazzone's wife called Mazzone at his business to inform him that Vita had arrived at their house.

Mazzone was convicted of one count of conspiracy to distribute cocaine, one count of conspiracy to import cocaine in an amount greater than twenty-eight grams into the State of Maryland, one count of conspiracy to possess cocaine with intent to distribute, and one count of conspiracy to possess cocaine. He was sentenced to ten years without the possibili-

ty of parole on the first count, and twenty years each on the second and third counts, to be served concurrently with the first count. Count four was merged with count three for sentencing purposes.

Mazzone appealed, and the Court of Special Appeals reversed his convictions on December 7, 1993. *Mazzone v. State*, 98 Md.App. 490, 633 A.2d 918 (1993). The court held that the marital communications privilege bars both the interception and disclosure of all communications between husband and wife that are intended to be confidential, including communications relating to criminal activities. *Id.* at 496–97, 633 A.2d 918. The court reasoned: "The intrusion into and disruption of the marital relationship flowing from the unsuspected electronic eavesdropping by police agents into private conversations between the couple is at least as dramatic and inimical as that occurring when one party seeks to disclose a confidence in court." *Id.* at 500, 633 A.2d 918. Therefore, the court held that the minimization guidelines improperly authorized the interception of privileged communications.

The court further held that this flaw in the minimization guidelines should be judged under a strict compliance standard, rather than the more lenient substantial or reasonable compliance standard. The court rejected the notion that the mistake in the guidelines was simply a mistake in the implementation of the order, stating, "What minimization guidelines *cannot* validly do, however, is authorize something that the statute prohibits, for even the order cannot do that...." *Id.* at 501–02, 633 A.2d 918. The court further opined that applying the substantial compliance standard to mistakes in the guidelines may permit "the State to circumvent the strict compliance standard by putting the offending provision in the minimization guidelines and then claiming that it is a 'post condition' subject to the more lenient substantial compliance standard." Finding the guidelines not to be in strict compliance with the statute, the court concluded that all evidence gathered pursuant to the wiretap should be suppressed.

## III

### A

First, we consider the ruling of the Court of Special Appeals that a judge cannot authorize monitoring agents to purposefully intercept privileged marital communications. *See Id.* at 500, 633 A.2d 918. Although we agree with the court's decision on this issue, we cannot accept its rationale.

The court found a prohibition on interception and disclosure of privileged marital communications by exploring the policy behind the privilege statute, rather than the words of the statute. *Id.* Such a rationale runs afoul of a basic principle of statutory construction by giving the marital communications privilege, codified in § 9–105, greater effect than the words of the statute can support. The statute concerns the competency of spouses to testify as to marital communications; it does not prohibit or even mention eavesdropping. In construing this very statute, we have clearly held that "a court may not as a general rule surmise a legislative intention contrary to the plain language of a statute. . . ." *Coleman, supra,* 281 Md. at 546, 380 A.2d 49. Despite the fact that the language of the statute clearly does not apply to interception, the Court of Special Appeals explored the policy behind the marital communications privilege and thereby attempted to extend its reach to prohibit interception of communications. Although the policy relied upon by the court may be important, the legislature, and not the courts, must act to effectuate that policy.

Although not flatly prohibiting the interception of marital communications, the legislature has prohibited their disclosure and provided that their interception must be minimized. In this regard, § 10–407 of the wiretapping statute provides that privileged communications remain privileged even after they are overheard by monitoring agents. We interpret this section to preserve any privilege that would have existed had there been no interception and no eavesdropper. Therefore, we view the statute as preserving the marital communications

privilege and prohibiting the court-authorized eavesdropper from testifying as to the contents of the communication.

One commentator has suggested that the section can be interpreted more narrowly to mean that the privilege survives between the parties to the communication, barring their testimony but not necessarily barring the use of the wiretap evidence. *See* Richard P. Gilbert, *A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law,* 8 U.Balt.L.Rev. 183, 203 (1979). As we see it, however, this does not fully preserve the privilege of the intercepted communications. The legislature must have realized that the intrusive potential of electronic eavesdropping is much greater than that of ordinary eavesdropping, and accordingly set up strict requirements for obtaining an order to conduct electronic eavesdropping, § 10–408, and rendered illegal all such eavesdropping without a valid wiretap order. § 10–402. Presumably, therefore, in preserving the privilege, the legislature saw a need for greater protection of privileged communications than is provided in the context of ordinary eavesdropping.[4] *See* 1 *McCormick on Evidence,* (John W. Strong et al eds., 4th ed. 1992) § 74 ("While in earlier times the confidentiality of privileged communications could generally be preserved by a modest attention to security, homespun measures will hardly suffice against the modern panoply of electronic paraphernalia."). We conclude, therefore, that the legislature intended to preserve the privileged nature of communications in the condition in which it would have existed had there been no court-authorized eavesdropper.

█ We further hold that the wiretapping statute does not permit a judge to authorize, without requiring minimization, interception of privileged marital communications. The purpose of a wiretap is to gather *evidence* of the commission of certain crimes listed in the wiretap statute. *See* § 10–406

---

4. We have never decided what effect, if any, the marital communications privilege statute has on the competency of a private eavesdropper, and we need not decide that in this case because § 10–407 distinguishes court-authorized eavesdroppers from all other eavesdroppers.

("[T]he judge ... may grant an order authorizing the interception of wire, oral, or electronic communications by investigative or law enforcement officers when the interception may provide or has provided *evidence* of the commission of [certain designated crimes].") (emphasis added). Because privileged marital communications, intercepted pursuant to a wiretap order, cannot be introduced as evidence at trial, such interceptions do not serve the purpose of a wiretap: to gather evidence. Therefore, such interceptions must be minimized.

Furthermore, this Court has acknowledged implicitly that interception of privileged marital communications must be minimized. In *Spease and Ross, supra,* 275 Md. at 100, 338 A.2d 284, we listed ten factors to consider in determining the reasonableness of an interception. Among these factors was "the absence of monitoring of privileged conversations." Moreover, this decision is in accord with federal case law. *See, e.g., United States v. Harrelson,* 754 F.2d 1153, 1168 (5th Cir.1985) (interpreting an identical federal wiretap provision, codified at 18 U.S.C. § 2518(5), and requiring monitoring agents to minimize interception of privileged communications), *cert. denied,* 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985).

We emphasize that minimization is not prohibition. Some privileged marital communications will be intercepted despite the monitoring agent's best minimization efforts.[5] Often the existence of a privilege depends on the circumstances surrounding the communication or on the contents of the communication. Sometimes an officer monitoring a wiretap cannot determine the existence of a privilege without hearing the conversation and assessing the circumstances. *See Poore v. State,* 39 Md.App. 44, 70, 384 A.2d 103 (1978) ("Only by hearing the conversation can it be determined to be privi-

---

5. The privilege provision acknowledges that privileged communications may be intercepted, referring to "[a]n otherwise privileged ... communication intercepted in accordance with ... the provisions of this subtitle." § 10–407(d). This wording in no way excuses the requirement of minimization; it simply acknowledges that, even with minimization, some privileged communications will be intercepted.

leged."), *cert. denied,* 282 Md. 737 (1978). Other times an officer will determine the existence of a privilege and stop monitoring, but will need to "spot monitor" the conversation thereafter to determine if the conversation has shifted to pertinent, non-privileged matters. *Id.* These practical considerations may cause the monitoring agents to innocently intercept some privileged conversations—a happenstance not fatally at odds with the requirement that the agents minimize such interceptions.

## B

█ Next, we consider whether a mistake in minimization guidelines concerning the marital communications privilege affects the validity of the entire wiretap order.[6] As earlier observed, the first set of minimization guidelines stated: "If it appears that the communication does discuss the commission of a designated crime itself, the privilege is breached and the whole conversation is to be monitored." Similarly, the second set stated: "[T]he privilege that is afforded to them under Maryland Law as husband and wife is breached during the interception of conversations that pertain to Mazzone's illegal drug activity." These statements are contrary to our decision in *Coleman, supra,* 281 Md. 538, 380 A.2d 49, where we found the marital communications privilege applicable when the communication was "an admission or confession of a crime," *id.* at 544, 380 A.2d 49, and thus refused to recognize an exception to the privilege where the communication was "made in furtherance of a crime." *Id.* at 545, 380 A.2d 49.

We must decide whether this offending language in the minimization guidelines is an error in the order itself (a precondition to which we apply the strict compliance standard) or simply an error in the implementation of the order (a post condition to which we apply the reasonable compliance standard). Under the first view, advocated by Mazzone, the mistake in the guidelines totally negates the minimization

---

6. The parties do not dispute that the minimization guidelines contained a misstatement of Maryland law concerning the marital communications privilege.

precondition required for the validity of the wiretap order. Under the latter view, advocated by the State, the mistake in the guidelines is considered as part of the implementation of the order and therefore is a post condition, subject only to a reasonable compliance standard. The Court of Special Appeals found the former view more convincing, holding that when the guidelines purport to authorize more than the order itself could have authorized, they are not simply implementing provisions.

We find the latter view more reasonable, and thus disagree with the premise of the Court of Special Appeals that the minimization guidelines, although not part of the wiretap order itself, *authorized* illegal interceptions. In other words, the guidelines did not authorize interception of communications; rather the authorization was contained in the orders. The guidelines were simply the first instance of judicial supervision over the implementation of the wiretap. That the supervision may have been mistakenly lenient in a certain area does not destroy the overall authorization granted in the order. Accordingly, we will consider the minimization guidelines as part of the total implementation of the wiretap order, and, to that implementation, we will apply the reasonable compliance standard. This standard focuses on the conduct of the monitoring agents.[7]

In *Spease and Ross, supra,* 275 Md. at 100, 338 A.2d 284, we listed the following ten factors to be considered in determining the reasonableness of minimization:

---

**7.** In *Spease and Ross, supra,* 275 Md. at 99, 338 A.2d 284, we indicated that the substantial compliance test also required good faith on the part of the monitoring agents. In doing so we relied on federal case law which has since been overruled by the Supreme Court in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). In *Scott,* the Court analogized to Fourth Amendment jurisprudence and held that minimization should be reviewed using an objective reasonableness standard, without regard to the subjective motivation of the officer monitoring the wiretap. We are not bound, however, by the Supreme Court's decision on this issue and may decide in the future to continue to require good faith. We need not decide the issue at this time because any mistakes in minimization made by the monitoring agents in this case were caused by erroneous instructions, not bad faith.

"(1) the nature and scope of the crime being investigated; (2) the sophistication of those under suspicion and their efforts to avoid surveillance through such devices as coded conversations; (3) the location and the operation of the subject telephone; (4) government expectation of the contents of the call; (5) the extent of judicial supervision; (6) the duration of the wiretap; (7) the purpose of the wiretap; (8) the length of the calls monitored; (9) the existence of a pattern of pertinent calls, which the monitoring agents could discern so as to eliminate the interception of non-pertinent calls; (10) the absence of monitoring of privileged conversations."

As factor number five indicates, judicial supervision and approval given to the guidelines may weigh in favor of finding the monitoring agent's conduct to be reasonable under the circumstances. Nevertheless, in order to protect the privacy interests that may be compromised by a judicial mistake, we will require more than simply judicial approval before minimization efforts are deemed reasonable. We will further evaluate the reasonableness of the minimization by considering the other nine factors listed in *Spease and Ross.* In this regard, we determine the reasonableness of the agent's action by comparing it to the minimization required by the law, and not to what was indicated in the flawed guidelines. Essentially, we ask the following question: Could the monitoring agents have reasonably intercepted the conversations that were intercepted if the agent had been given correct minimization instructions? In answering this question, we will not require the monitoring agents to make what we, in hindsight, consider to be perfect decisions; rather we require only reasonable decisions under the circumstances.

This approach balances conflicting privacy and law enforcement considerations that are present in the context of wiretapping. The Court of Special Appeals expressed concern that the State could "circumvent the strict compliance standard by putting the offending provision in the minimization guidelines and then claiming that it is a 'post condition' subject to the more lenient substantial compliance standard." *Mazzone, su-*

*pra,* 98 Md.App. at 502, 633 A.2d 918. This concern, we think, is not well-founded.

First, viewing the guidelines as part of the implementation will encourage use of more detailed guidelines, thus reducing the discretion of the monitoring officers and thereby affording greater protection to the privacy of suspects being monitored under the order. Neither the statute nor Maryland case law requires that the judge issue or approve minimization guidelines. Several federal cases that have considered the issue have refused to require detailed minimization instructions because such a requirement would eliminate the flexibility often necessary to conform minimization to the special circumstances of the investigation, circumstances that are unknown at the time the judge issues the order. *E.g., United States v. Fino,* 478 F.2d 35, 37 (2nd Cir.1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); *United States v. London,* 424 F.Supp. 556, 563 n. 6 (D.Md.1976), *aff'd sub nom, U.S. v. Clerkley,* 556 F.2d 709 (1977), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978). *See also U.S. v. Gotti,* 771 F.Supp. 535, 546 (E.D.N.Y.1991) (rejecting an attack on minimization instructions that did not contain instructions on certain privileges and stating: "There is no statutory requirement of which I am aware as to what the instructions to the monitoring agents must contain."). If the judge does adopt guidelines, they would constitute the first instance of continuing judicial supervision. Ideally, this supervision would begin immediately after the judge issues the order, before any privacy rights may be compromised. Accordingly, we refuse to impose a heightened standard of compliance on monitoring instructions simply because they are approved by a judge.

Second, the reasonable compliance test will guard against purposeful inclusion of incorrect instructions in the minimization guidelines. Unlike the strict compliance standard, this standard will not discourage State's Attorneys from presenting the guidelines to a judge, who will then review them to determine if they contain any misstatements of the law. To rule that a judge's involvement at this level elevates the

standard to strict compliance would likely deter judicial involvement, thereby eliminating one of the safeguards against purposeful non-minimization of interceptions under the wiretap order.

Consistent with this view, James G. Carr, a commentator in the field of wiretapping, has stated:

> "Whether general guidelines or specific instructions were adequate in the particular case does not, standing alone, determine the lawfulness of the surveillance. In that regard the important question is not what the agents were told, but what they did when executing the surveillance. Thus, even if the guidelines were too permissive, but the surveillance was adequately minimized, it will be found to be lawful."

*The Law of Electronic Surveillance*, § 5.7(c) (1994) (citing *United States v. Geller*, 560 F.Supp. 1309, 1324 (E.D.Pa.1983), *affd. sub nom, U.S. v. DeMaise*, 745 F.2d 49 (1984), *cert. denied*, 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985)).

■ The evidence before us reveals that, in the overall implementation of the wiretap, the monitoring officers reasonably complied with the minimization mandate. The record discloses only two brief examples of the failure of the monitoring officers to minimize interception of privileged marital conversations. In the first conversation, Mazzone's wife asked him to bring some cocaine home with him, saying that he should not "come home empty-handed." In the second conversation, Mazzone's wife informed Mazzone that Vita had arrived at their house. Applying the ten *Spease* factors, we find that the monitoring agents could have reasonably intercepted these two conversations even if they had been instructed properly concerning the marital communications privilege. In the first place, not all conversations between husband and wife are privileged, such as conversations that occur in the presence of third parties or concern matters intended to be communicated to third parties. Therefore, the monitoring agents need not terminate the interception as soon as they identify a husband and wife as parties to the conversation.

Rather, depending on the existence of the ten *Spease* factors, the agents may continue listening for a short period of time to determine the existence of a privilege, and may spot monitor thereafter to determine if the conversation has shifted to non-privileged communications.

In this case, the fifth *Spease* factor lends reasonableness to the agent's interception of the two privileged conversations. The agents acted pursuant to guidelines approved by a judge. As we have said, this factor alone cannot absolutely shield the wiretap from attack. Therefore, we examine other factors to determine if the monitoring agents could have reasonably intercepted the two conversations if they had been following correct minimization instructions.

The first and second *Spease* factors weigh in favor of longer monitoring in this case. The drug distribution ring in this case was a complex operation. The participants in the ring used coded conversations in an attempt to disguise their operation in the event that government agents were listening. For example, a government expert testified at trial that the participants in the ring referred to cocaine as bull roast tickets. Given this degree of sophistication on the part of the participants in the crime, the agents could have reasonably believed that those involved would use initial conversations between husband and wife to mask conversations between others. In addition, the agents could have reasonably concluded that a husband and wife would use initial "small talk" to hide a conversation in which one instructed the other to convey a message to a third person.

The eighth factor also weighs in favor of the agent's action. Both conversations were brief and would have been fully completed within the initial monitoring period. The longer of the two conversations filled only three pages of transcript.

With respect to the ninth factor, the agents could not possibly have determined a pattern of privileged conversations from just these two calls out of a total of 9,779 calls intercepted during the wiretap operation. In fact, the agents could have reasonably believed that the conversation concerning

David Vita's arrival was not privileged because Vita was listening to the conversation; the transcript indicates that the monitoring agents could hear Vita in the background. After applying the *Spease* factors, we find that the monitoring officers acted reasonably under the circumstances, thereby substantially complying with the minimization requirement.

Even if we found the officer's actions to be unreasonable, the sanction would not be to suppress *all* communications intercepted by the monitoring agents. The maximum sanction for violation of the reasonable compliance standard, in the circumstances of this case, would require suppression of only the conversations that were unreasonably intercepted. In the context of the two privileged conversations before us, the partial suppression sanction is no more severe than the exclusion already required by the privilege.[8] Our conclusion is supported by the words of the wiretapping statute and analogous Fourth Amendment case law.

First, § 10–408(i) permits suppression of "any intercepted wire, oral, or electronic communication, or evidence derived therefrom" when "[t]he interception was not made in conformity with the order of authorization." § 10–408(i)(1)(iii). The legislature's use of singular nouns ("communication" and "interception") indicates that the suppression remedy is to be applied separately to individual communications or interceptions.[9] The words of the statute simply do not permit suppression of evidence validly obtained under the order as a sanction for interceptions made in violation of the order. *See United States v. Dorfman*, 542 F.Supp. 345, 394, (N.D.Ill.1982) (similarly interpreting an identical federal provision codified at

---

8. Although we need not here consider the matter, a court may have to determine, in some cases, whether the privileged communication that was unreasonably intercepted yielded any derivative evidence, which would also have to be suppressed. *See* § 10–408(i) (permitting suppression of the communication "or evidence derived therefrom").

9. In contrast, one of the other grounds for suppression involves an attack on the validity of the wiretap order, which, if successful, would certainly require suppression of all the evidence obtained under the order. *See* § 10–408(i)(1)(ii).

18 U.S.C. § 2518(1)(a)), *aff'd on other grounds,* 690 F.2d 1217 (7th Cir.1982), *rev'd on other grounds,* 690 F.2d 1230 (7th Cir.1982).

Second, in *Klingenstein v. State,* 330 Md. 402, 624 A.2d 532 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 312, 126 L.E.2d 259 (1993), we decided that partial suppression is the correct sanction to apply when police violate the scope of a search warrant. We stated:

> "In short, it appears to be universally recognized that under the Fourth Amendment the exclusionary rule does not act to suppress evidence seized within the scope of a warrant simply because evidence outside the scope of a warrant was unlawfully seized. In other words, the general rule is that only those items which were unconstitutionally seized are to be suppressed; those which were constitutionally seized may stand."

*Id.* at 410, 624 A.2d 532. Failing to minimize is essentially equivalent to violating the scope of a search warrant; each creates an intrusion into the privacy of the suspect equal to the intrusion created by the other. Accordingly, we see no reason to require a greater sanction in the context of wiretapping than in the context of a search warrant.

In *United States v. Focarile,* 340 F.Supp. 1033, 1047 (D.Md. 1972), *aff'd on other grounds sub nom., United States v. Giordano,* 469 F.2d 522 (4th Cir.1972), *aff'd,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), the court suggested that partial suppression may cause monitoring agents to disregard minimization instructions. The court there said:

> "Knowing that only 'innocent' calls would be suppressed, the government could intercept every conversation during the entire period of a wiretap with nothing to lose by doing so since it would use at trial only those conversations which had definite incriminating value anyway, thereby completely ignoring the minimization mandate of Title III."

*Id.* at 1047. *See also United States v. Ozar,* 859 F.Supp. 1545, 1583, 1994 U.S.Dist. LEXIS 11727, *125, 1994 WL 448999 (W.D.Mo.1994) (quoting *Focarile* ). This view, as we see it, is

not compelling enough to override the obvious meaning of the wiretapping statute and the clear weight of authority in Fourth Amendment case law. Furthermore, we think it incorrect to assume that partial suppression will leave monitoring agents without any incentive to minimize; monitoring agents who intentionally fail to minimize may be subject to civil liability, including actual damages, punitive damages, and attorney's fees. § 10–410. *See also United States v. Cox*, 462 F.2d 1293 (8th Cir.1972) (advocating partial suppression and suggesting a civil suit against the investigating officers as a remedy for unauthorized interception), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974).

## C

█ Finally, we hold that the admission of the two marital communications into evidence at the trial requires that Mazzone's convictions be reversed and that the case be remanded for a new trial in the event that other issues raised by Mazzone on appeal to the Court of Special Appeals, but not decided by that court, are found to be without merit. It is clear to us that the intercepted marital communications were presumed to be confidential and therefore privileged. *Enriquez, supra*, 327 Md. at 372, 609 A.2d 343. The State has not adequately rebutted this presumption. Accordingly, we conclude that the two communications were in fact privileged.

The State argues that the use of the privileged communications at trial was harmless error. Under our decision in *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976), an error in a criminal case is not harmless "unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Id.* at 659, 350 A.2d 665.

When the jury heard the conversation in which Mazzone's wife asked him to bring home some cocaine, it could have drawn several inferences that would aid in a determination of guilt. It could have inferred that Mazzone had cocaine or had easy access to it and that his wife knew or believed he had

cocaine. Plainly, the State intended for the jury to draw these inferences.

Similarly, the communication concerning Vita may have played a role in the jury's guilt determination. Vita was a significant figure in the cocaine distribution ring. A communication concerning his whereabouts at a particular time and place may have added credibility to the State's theory of the case. Therefore, applying the *Dorsey* standard, we cannot declare, beyond a reasonable doubt, that the introduction of the two privileged communications at trial was harmless error.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT FOR FURTHER APPELLATE PROCEEDINGS CONSISTENT WITH THIS OPINION TO DETERMINE THE MERITS OF OTHER ISSUES RAISED ON APPEAL BUT NOT DECIDED BY THAT COURT. COSTS TO BE PAID BY BALTIMORE COUNTY, MARYLAND.*

BELL, Judge, dissenting.

I agree entirely with the opinion in *Mazzone v. State,* 98 Md.App. 490, 633 A.2d 918 (1993). Accordingly I dissent.