**CASE NO. 2188, SEPT. TERM, 2016**

**EVIDENCE – PRIVILEGED COMMUNICATIONS – SPOUSAL COMMUNICATIONS PRIVILEGE**

Text messages between spouses are presumed to be confidential communications for the purpose of applying the spousal communications privilege.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2188

September Term, 2016

KEVIN SEWELL

v.

STATE OF MARYLAND

Wright,
Graeff,
Raker, Irma S.
    (Senior Judge, specially assigned),

JJ.

Opinion by Raker, J.

Filed: March 5, 2018

Appellant Kevin Sewell appeals from the judgments of convictions in the Circuit Court for Worcester County for the offenses of first degree murder, child abuse in the first degree, and neglect of a minor. He presents the following questions for our review:

"1. Did the trial court err in admitting privileged marital communications?

2. Should this Honorable Court exercise plain error review and reverse Appellant's convictions based on the State's improper opening argument?"

We shall hold that the trial court erred in admitting into evidence communications between appellant and his wife which were privileged marital communications. Because we reverse on this issue, we do not address appellant's second issue.[1]

I.

The Grand Jury for Worcester County returned an indictment charging appellant with the offenses of first degree murder, child abuse in the first degree, second degree murder, and neglect of a minor child. He proceeded to trial before a jury and on September

---

[1] The alleged improper State's argument is often referred to as a "first-person" argument. We note that courts around the country have split on the propriety of such first-person arguments, although in the context of the prosecution's closing arguments rather than opening statements. *Compare Malicoat v. State*, 992 P.2d 383, 401 (Okla. Crim. Appl. 2000) (holding that first-person argument that "does not manipulate or misstate the evidence" was not error), *and McCray v. State*, 88 So.3d 1, 50 (Ala. Crim. App. 2010) (holding that first-person argument that only included reasonable inferences from the evidence was not error), *with Drayden v. White*, 232 F.3d 704, 712–13 (9th Cir. 2000) (holding that first-person argument was error but did not render the trial "fundamentally unfair" which would have entitled defendant to a new trial), *and Hawthorne v. United States*, 476 A.2d 164, 172–73 (D.C. 1984) (holding that first-person argument substantially prejudiced the defendant as to require a new trial).

23, 2015, the jury found appellant guilty of first degree murder, child abuse in the first degree, and neglect of a minor child. The court imposed a term of life imprisonment without the possibility of parole for murder; thirty years' imprisonment, to be served concurrently with the life term, for child abuse; and a term of five years' imprisonment to be served consecutive to the life term for neglect.

The following facts emerged at trial. The victim in this case was Luke Hill, a child born on March 28, 2012. Luke died on May 5, 2015, and according to Dr. Wendy Gunther, the cause of his death was shaken/slam syndrome, with additional blunt trauma to Luke's chest, abdomen, back, and extremities, and bite marks on his body.

Appellant was Luke's uncle. He is married to Amanda Sewell, the sister of the victim's mother, Victoria Harmon. Ms. Harmon testified that Amanda and appellant would babysit Luke occasionally, and that she drove Luke to their house on May 2, 2015, leaving him there overnight. When Amanda returned Luke to Ms. Harmon on May 3, his eyes were closed, he was making a "phlegmy kind of sound," and he was covered in bruises. Ms. Harmon called 911 immediately. Luke was transported to the hospital where he died on May 5. Several witnesses testified that Luke had no injuries before he arrived at appellant's home. Robert Nottingham, a firefighter, testified that on May 3, he had just returned from work when Nick Miller (Ms. Harmon's fiancé) asked him to look at Luke. From his training, he realized that Luke needed an ambulance immediately.

The State charged appellant and Amanda with crimes related to Luke's death. The State compelled Amanda to testify against appellant, granting her use immunity for her testimony.

On December 14, 2015, appellant filed a pre-trial motion to exclude from evidence text messages sent by him to his wife, arguing that the messages should be excluded as violative of the marital privilege. On January 13, 2016, the court held a hearing on appellant's motion. The court denied the motion in an order on January 20, without specifying its reasoning.

At trial on September 20, 2016, the State delivered the first two-thirds of its opening statement[2] speaking as the victim. Appellant did not object at any time during the State's opening statement.

During trial, the State introduced photographs of Amanda's phone screen, displaying the text messages she and appellant exchanged on May 3, with timestamps added to almost every text message. Appellant renewed his objection to the text message evidence, which the court overruled. Next, the prosecutor and Amanda read the texts, with the prosecutor reading appellant's texts and Amanda reading her own. They read the texts to the jury as follows:[3]

[AMANDA 9:07:22 a.m.]: Everything okay?

[APPELLANT 9:14:15]: Ye boo.
[APPELLANT 9:14:28]: He doesn't listen worth shit, but we're fine.
[APPELLANT 9:14:49]: I think Tori told me he breaks out from grass.

---

[2] This ratio is based on the transcript of the opening statement, which was a little over ten pages. The portion in which the prosecutor spoke as Luke Hill covered about seven of those ten pages.

[3] The text of these messages is taken from the trial transcript, to avoid confusion over abbreviations and misspellings. Timestamps are taken from the transcript where available, or the photographs when the transcript does not include them.

[APPELLANT 9:15:02]:  I wonder if that's why his neck and chest are broke out.

[AMANDA 9:15:48]:  His ear is bruised.

[APPELLANT 9:16:34]:  Yeah, it sure it [sic].
[APPELLANT 9:16:47]:  Maybe him and Landon were roughhousing.

[AMANDA 9:33:14]:  He's very skittish.

[APPELLANT 9:40:58]:  Yeah, he is.  I've noticed.
[APPELLANT 9:41:00]:  Why, though?

[APPELLANT 9:47:55]:  He threw up on our sheets.
[APPELLANT 9:48:24]:  Phoebe was sleeping, and he started screaming, so I made him lay down.
[APPELLANT 9:48:32]:  Then he threw up on our bed.

[AMANDA 9:53:43]:  Nice.
[AMANDA 9:54:23]:  Strip the bed and put what you can in the washer, please.

[APPELLANT 10:02:27]:  Okay.

[AMANDA 10:12:49]:  Thank you.  How are you?

[APPELLANT 10:13:07]: Good boo boo.

[AMANDA 10:32:39]:  You going with me to take him home?
[AMANDA 10:41:48]:  ?
[AMANDA 11:20:32]:  ?

[APPELLANT 11:44:12]: I thought you were taking him tomorrow.
[APPELLANT 12:05:59 p.m.]:  What time you getting off?

[AMANDA 12:32:19]:  Today.
[AMANDA 12:32:27]:  1:30.

[APPELLANT 12:35:39]:  Okay.
[APPELLANT 12:35:53]:  That's fine because he's acting like a fucking asshole.

4

[APPELLANT 12:36:20]: He ignores you like he's retarded. He's thrown up twice and all he does is whine.
[APPELLANT 12:36:28]: This is the last time.
[APPELLANT 12:37:21]: The other thing I have been entertained by is him running around saying butt fuck. He starts clapping and looking for high fives.

[AMANDA 12:51:54]: WTF.
[AMANDA 12:53:25]: You going to do the yardwork while I'm gone?
[AMANDA 12:59:49]: ?

[APPELLANT 1:13:57]: I don't know, maybe.
[APPELLANT 1:14:10]: This has been a day from hell. He's finally asleep on our room.
[APPELLANT 1:14:28]: Please get me a bottle. This has been a day from hell.
[APPELLANT 1:25:00]: Please.

[AMANDA 1:31:43]: Okay.
[AMANDA 1:32:58]: I'll be off around 2.

[APPELLANT (unspecified time)]: Okay.
[APPELLANT 2:18:14]: Is it too late for you to get me a shot, too?
[APPELLANT 2:18:23]: If so, it's fine. I can run out.

[AMANDA 2:19:12]: I'll give you the money. I'm still at work.

[APPELLANT 2:19:12]: Okay.
[APPELLANT 2:19:16]: I have money.

[Counsel establishes that Amanda was driving Luke home by 3:16 p.m., at which time appellant sent the following texts.]

[APPELLANT 3:16:16]: Hey, I love you. Be careful.
[APPELLANT 3:16:45]: Don't tell them o [sic] bit him back. LOL. Blame Landon.
[APPELLANT 3:17:01]: I didn't even bite him hard, but, apparently, he bruises easy.

5

[AMANDA 3:18:33]: I told her he had bruises. I'll just say they were all ready [sic] there.
[AMANDA 3:18:42]: I love you, too.

[APPELLANT (unspecified time)]: I'm glad we have a day off together.
[APPELLANT 3:19:42]: Well, he bit the shit out of me.
[APPELLANT 3:19:51]: How else will he learn not to bitw?
[APPELLANT 3:19:53]: Bite.

[AMANDA 3:20:22]: Right.
[AMANDA 3:20:33]: I only get on you because I know you can do better.

[APPELLANT 3:20:46]: I'd be more concerned about all the bruises.

On cross-examination, Amanda testified that she had called her sister the night prior because Luke was not well, and told her that Luke had a knot on his head, bruises like black eyes, and additional bruises behind his ears and on his arms, legs, and chest. Her sister did not check on Luke, nor did she come and get him. After several other neighbors and the firefighter Mr. Nottingham testified, the Warden of the Worcester County jail and Jason Hill, an inmate there, testified that appellant told Hill that he struck Luke and Hill reported it to the Warden.

Appellant called no witnesses.

Fifteen percent of the prosecutor's closing argument[4] consisted of reviewing the text messages between appellant and Amanda as follows:

"[THE STATE]: Cell phones can be a blessing and a curse. Sometimes probably when you're driving in the car and you're

---

[4] This ratio is based on the transcript of the closing argument, which was about twenty-six pages. The portion in which the prosecutor discussed the text messages covered about four of those twenty-six pages.

6

thinking, you know, I would really just like some quiet time, and the phone is ringing, you think of them as a curse. Sometimes they are a blessing, though, like when you need to call 911.

For [appellant] they were a curse on May 3rd of 2015 because you were able to, we were all able to, see in great detail what occurred during the morning into the afternoon hours of Sunday, May 3rd. These cell phone text messages give you all a window into 607 Oxford Street just as surely as that window lets you look outside. The timestamps will tell you when things were said and correlate to what was going on at that time.

So at that 9:07 Amanda says, everything okay?

The Defendant says, ye boo. He doesn't listen worth shit, but we're fine, at 9:14 in the morning.

He then says, I think Tori told me he breaks out from grass. I wonder if that's why his neck and chest are broke out. He's now planning?

Amanda mentions that he's very skittish, and [appellant] says, yes, I've noticed.

He then confirmed what we already know through the observations and testimony of Amanda, that he threw up on our sheets. Significant because of the injuries. This is at 9:47:55.

We know now why. Phoebe was sleeping, and he started screaming, so I made him lay down. I made him lay down.

Do you remember Doctor Starling's testimony regarding triggers? What makes people do this type of thing? Children that don't listen. Children who are being potty trained. Children who might wake up another sibling in the house.

He then says at 9:48, he then threw up on our bed. Amanda's response, nice. And then she says, strip the bed and put what you can in the washer, please. And he responds, okay, at 10:02.

At 10:32:39 Amanda says, you going with me to take him home?

What's also occurring between 10:30 and 10:45? Christopher Payne is outside in his yard hearing a blood-curdling scream.

Question mark number one and question mark number two, these take place, I submit, because [appellant] hasn't responded to her question, which is, are you going to take—are you coming with me to take him home?

7

He responds one hour and twelve minutes later. And when you look at the text messages, you look at the timestamps and how quickly he responds during the course of the day, except for right now. One hour and twelve minutes to respond, you going home—you going with me to take him home?

I thought you were taking him tomorrow.

He inquires what time she's getting off.

She responds, we're taking him today, and I get off about 1:30.

And he says, at 12:35, that's fine because he's acting like a fucking asshole.

[Appellant] says, he ignores you like he's retarded. He's thrown up twice, and all he does is whine. Triggers?

The Defendant, [appellant], says, at 12:36:28, this is the last time.

At 1:14 in the afternoon [appellant] sends a text message to Amanda that says, this has been a day from hell. He's finally asleep on our room.

And a few seconds later he says, please get me a bottle. This has been a day from hell.

And follows up 11 minutes later with a please.

At 3:16:16 in the afternoon, Sunday, May 3rd, 2015, [appellant] sends a message to Amanda that says, hey, I love you. Be careful.

We know from Amanda's testimony that she was in the Chrysler Pacifica at this time taking Luke back to his home. Luke is unconscious. His eyes are kind of open, and he's snoring. And [appellant], the Defendant, at 3:16:45 says, don't tell them I bit him back. LOL. Blame Landon.

And then says, I didn't even bite him hard, but, apparently, he bruises easy.

And Amanda, going along with it, says, I told her he had bruises, so I'll just say they were already there.

Amanda tells [appellant] at 3:20:33, I only get on you because I know you can do better."

Appellant's closing argument, among other arguments, said appellant had no motive to kill Luke: "There was certainly no motive here to kill. There's no reason. Even if you're dealing with a troublesome and whiny child, he's going home in two hours."

The State's rebuttal closing argument addressed the motive question as follows:

> "[THE STATE]: [Defense counsel] mentions the lack of motive. The motive is and are the triggers were talked about. Those triggers are in the text messages.
>
> And you can always tell the strength or weakness of a case by what the attorney doesn't talk about. What did [defense counsel] not talk about? He didn't talk about, essentially, the confession of [appellant] in the text messages. He called Luke Hill an asshole. He tried to conspire with his wife to cover up his assaultive behavior. You can't get around that. That's why [defense counsel] didn't discuss it."

The prosecutor used one of the text messages to frame the conclusion of his rebuttal closing argument as follows:

> "[THE STATE]: [Appellant] told his wife at 12:36 on [May 3], this is the last time. I am confident that when you take the constellation of symptoms, when you take the constellation of injuries, and combine that with what you know is impossible, then you will return a verdict, and that verdict will tell [appellant] that this is the last time."

As indicated *supra,* the jury returned guilty verdicts on all counts, the court imposed the life sentence, to be served without benefit of parole, and this timely appeal followed.

## II.

Before this Court, appellant argues that the trial court erred in admitting privileged marital communications, *i.e.*, the text messages between appellant and his wife. He argues that communications between spouses are presumed to be confidential, and that a waiver of the privilege will be found only in the clearest of circumstances. This presumption of confidentiality, he argues, may be rebutted only "by a showing that the communication was not intended to be confidential, or was made to, or in the presence of a third party." *State v. Mazzone*, 336 Md. 379, 384, 648 A.2d 978, 980 (1994) (internal citations omitted). He

9

maintains that in this case, the State presented no facts to rebut the presumption that the text messages were privileged.

Appellant asks us to recognize as plain error the opening statement of the State where the prosecutor spoke to the jury in the voice of three year old Luke Hill. He considers it a "golden rule" argument in which "a prosecutor improperly appeals to the passions of the jury, and asks jurors to place themselves in the shoes of the victim."

The State argues that the trial court exercised its discretion properly in admitting into evidence text messages sent by appellant to his wife's telephone. The State appears to present three grounds to support the admission of the text messages. First, appellant did not meet his burden of establishing the element of "confidentiality" and, therefore, he failed to demonstrate his entitlement to the "narrowly construed" marital privilege. Because testimonial privileges are not designed or intended to facilitate the fact-finding process or to safeguard its integrity, they are a disfavored departure from the norm, and should be strictly construed. Moreover, according to the State, any ambiguity or close call with respect to whether a privilege applies should be resolved against the privilege. Factually, appellant sent texts to his wife's cellphone while she worked at a restaurant. By sending information over the phone, over which he had no control, he ran the risk that someone besides Amanda would retrieve the message. Concluding, the State asserts that appellant failed to show he had a reasonable expectation of confidentiality in the text messages.[5]

---

[5] The State makes clear that its argument here is case and fact-specific, and not that text messages can never convey confidential marital communications. The State suggests that the party asserting the privilege with respect to text messages (footnote continued . . .)

Second, in the event appellant is arguing that the admission of the text through appellant's wife violated the testimonial spousal privilege, testimonial spousal privilege does not apply where charges involve the abuse of a child under the age of 18. *See* Md. Code, Courts and Judicial Proceedings Article, § 9-106(a)(1).

Third, the State maintains that by communicating via text messaging, appellant implicated a third party, *i.e.*, his service provider, Verizon. The State quotes from Verizon's privacy agreement, which contains a statement that information may be shared pursuant to "subpoenas, court orders or search warrants and as otherwise authorized by law."

The State asserts also that even if the admission of the text messages was erroneous, any error was harmless beyond a reasonable doubt. The content of the messages does not contain a confession to any of the charges. The State offered more than enough other evidence to eliminate any other suspect, including medical records and eyewitness accounts that Luke was fine until Amanda left for work on May 3, testimony from a neighbor who heard a blood-curdling scream come from the house, and Amanda and Ms. Harmon's testimony about Luke's behavior and appearance once Amanda returned home from work. DNA analysis and bruises on appellant's knuckles pointed towards appellant striking Luke. Appellant's cellmate testified appellant made statements that were both consistent with the other evidence and unlikely to be known to anyone but appellant. If

could generate evidence that the recipient secured the phone by a passcode or set up the phone to ensure text messages would not appear on the screen if the phone was locked.

11

admitting the text messages was error, it was harmless because the rest of the evidence was overwhelming.

The State argues that this Court should not review its opening statement for plain error. Maryland has never reviewed a prosecutor's opening statement for plain error. This opening statement was not improper, as the only limitation is not to refer to facts that the State does not expect to prove during the trial. The State responds to appellant's "golden rule" claim that this rhetorical device is not a "golden rule" violation. "Golden rule" arguments encourage jurors to consider their own interests in deliberation rather than the evidence presented, and the opening statement here confined itself to the evidence. Appellant bears the burden to prove material prejudice that requires plain error review, which appellant has failed to even attempt to do.

III.

It is "within the sound discretion of the trial court to determine the admissibility of evidence." *Blair v. State*, 130 Md. App. 571, 592, 747 A.2d 702, 713 (2000). An abuse of discretion occurs when "no reasonable person would take the view adopted by the trial court, or when the court acts without reference to any guiding rules or principles." *Brass Metal Prods., Inc. v. E-J Enters., Inc.,* 189 Md. App. 310, 364, 984 A.2d 361, 393 (2009) (internal citations omitted).

Judge Charles E. Moylan, Jr., writing for the Court of Special Appeals in *Ashford v. State*, 147 Md. App. 1, 65, 807 A.2d 732, 769 (2002), emphasized that testimonial

privileges such as the marital privilege are disfavored, and explained the significance of that status as follows:

> "Keeping in the forefront of the mind the appreciation that testimonial privileges are disfavored, rather than favored, and are to be strictly construed, rather than liberally construed, is important because that decided 'tilt' may well be dispositive in close or ambiguous cases. As this Court observed in *Ellison v. State,* 65 Md. App. at 326–27, 500 A.2d [at 652 (1985)]:
>
> '[A] brief word is in order as to why it is important for us to determine whether testimonial privileges are in favor or disfavor. *In an otherwise close case* for the application of a testimonial privilege, a case that could plausibly go either way, *the "tilt" to be taken by the court is critically important.* If testimonial privileges are determined to be in favor, our "tilt" toward finding the privilege applicable could well be decisive in that direction. *If,* on the other hand, *testimonial privileges are determined to be in disfavor, our "tilt" toward finding the privilege inapplicable could well be decisive* in the other direction.'"

(Emphasis in original). The disfavored testimonial privileges must be strictly construed and any ambiguous claims of these privileges will tend to be rejected.

The marital privilege is in fact two distinct privileges: the privilege protecting confidential marital communications and the privilege against adverse spousal testimony. *See Trammel v. United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 913 (1980). In this case, the adverse spousal privilege, one vested in the witness spouse, was not claimed. At issue here is the marital communication privilege, which enables either spouse the right to preclude the disclosure of any confidential communications between the spouses. *See United States v. Parker,* 834 F.2d 408, 410–11 (4th Cir. 1987).

13

Under the common law, and Maryland law, spouses enjoy a right, albeit limited, to protect the confidentiality of some, but not all, marital communications. *Coleman v. State*, 281 Md. 538, 541, 380 A.2d 49, 52 (1977); s*ee also* 8 Wigmore, *Evidence*, § 2336 (McNaughton rev. 1961). In Maryland the marital privilege is found at § 9-105 of the Courts & Judicial Proceedings Article: Confidential communications between spouses. The statute provides as follows: "One spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage."[6] Either spouse can prevent the other from testifying as to such confidential communications.

Private discussions and exchanged information between spouses are confidential and protected by the privilege. *Blau v. United States*, 340 U.S. 332, 333, 71 S. Ct. 301, 302 (1951).[7] Marital communications are presumed confidential, which qualifies them for the privilege. *State v. Enriquez,* 327 Md. 365, 372, 609 A.2d 343, 346 (1992). This presumption is rebuttable, however, when a party shows that "the communication was not

---

[6] The statute has been interpreted by the Court of Appeals in such a manner that the section "does not render a spouse 'incompetent' in any manner, but simply provides a privilege, exercisable and waivable by the person who made the confidential communication, to preclude the person's spouse from disclosing that communication through testimony." *Brown v. State*, 359 Md. 180, 202, 753 A.2d 84, 96 (2000).

[7] Many jurisdictions recognize as an exception to the marital privilege communications or exchanges of information (known as the joint crime exception) that have to do with the commission of a crime in which both spouses played a role. *See, e.g., United States v. Broome*, 732 F.2d 363 (4th Cir. 1984). Maryland has not adopted this exception. *See Coleman v. State*, 281 Md. 538, 545–47, 380 A.2d 49, 54–55 (1977) (noting that the Maryland statute contains no such exception and the privilege under this section applies where the confidential communication is made in furtherance of a crime).

intended to be confidential." *Id.* If this presumption has been thoroughly rebutted, the "burden of establishing the element of confidentiality" falls on the claimant. *Ashford*, 147 Md. App. at 69, 807 A.2d at 771. Because of the disfavor with which the courts look upon the use of testimonial privileges at trial, "we resolve an ambiguity against the privilege, rather than in its favor." *Id.* at 70, 807 A.2d at 772. The presumption itself, however, is not ambiguous, but evidence introduced to rebut the presumption and/or subsequently establish confidentiality can lead to ambiguity.

"Communications between husband and wife occurring during the marriage are deemed confidential if expressly made so, or if the subject is such that the communicating spouse would probably desire that the matter be kept secret, either because its disclosure would be embarrassing or for some other reason." *Coleman,* 281 Md. at 542, 380 A.2d at 52; *see* 1 Kenneth S. Broun & Robert P. Mosteller, *McCormick on Evidence* § 80 (2016). As to the presumption of confidentiality, in *Coleman*, the Court of Appeals noted that the nature of the communication could indicate that it was intended to remain confidential, such as "where . . . the marital communication amounts to an admission or confession of a crime; in such circumstances, the courts have generally recognized the confidential nature of the communication." *Id*. at 544, 380 A.2d at 53. The spouse claiming the privilege does not have to initially establish the confidential nature of the communication because it is presumed confidential. *Id.* at 543, 380 A.2d at 52.

The circumstances of a given case can negate this presumption of confidentiality. *See, e.g.*, *Pereira v. United States*, 347 U.S. 1, 6, 74 S. Ct. 358, 361 (1954) (holding that the presence of a third party renders communications non-confidential); *Wolfle v. United*

15

*States*, 291 U.S. 7, 14–17, 54 S. Ct. 279, 280–81 (1934) (holding that the dictation of a letter to a secretary renders the communication non-confidential); 8 Wigmore, *Evidence*, § 2336 (McNaughton rev. 1961). The presumption is rebutted where it is shown that the communication was not intended to be confidential, or was made to, or in the presence of a third party. *Pereira*, 347 U.S. at 6, 74 S. Ct. at 361; *Wolfle v. United States*, 291 U.S. at 14–17, 54 S. Ct. at 280–81; *Gutridge v. State*, 236 Md. 514, 516, 204 A.2d 557, 559 (1964); *Master v. Master*, 223 Md. 618, 623–24, 166 A.2d 251, 255 (1960); *Metz v. State*, 9 Md. App. 15, 19, 262 A.2d 331, 333 (1970). For example, the fact that a husband knew that his wife could not read without the assistance of a third party would rebut the presumption that he intended a letter which he sent to her to remain confidential. *See Grulkey v. United States*, 394 F.2d 244, 246 (8th Cir. 1968); *State v. Fiddler*, 57 Wash. 2d 815, 820, 360 P.2d 155, 157–58 (Wash. 1961). In another case, a husband left his wife a message on their answering machine, but because the evidence showed that other people lived in their home and had access to the machine, the message could not be intended as confidential between just the spouses. *Wong-Wing v. State*, 156 Md. App. 597, 609–10, 847 A.2d 1206, 1213 (2004).

The text messages exchanged between appellant and his wife were marital communications. Applying the presumption that marital communications are privileged, they are presumed to have been confidential. It is, therefore, incumbent upon the State to rebut that presumption, and to show that the parties did not intend the communication to have been confidential. In the cases where the court admitted spousal communications, the

16

State presented facts (*e.g.*, the wife's illiteracy, the location and use of the answering machine) that rebutted the presumption of confidentiality.

The State has not rebutted the presumption of a confidential communication. Simply because the communications were over a cell phone in the nature of text messages does not rebut the presumption. [8] The State's argument that any person could have seen the messages is inadequate. Cell phones have mechanisms to lock access to texts. Especially given the inculpatory nature of the conversation between appellant and his wife, it was incumbent upon the State to offer some facts and circumstances to rebut the presumption of confidentiality, which the State failed to do. We hold that the trial court abused its discretion in admitting the text messages because they were confidential marital communications.

The admission of the text messages was not, as the State claims, harmless error. While a significant amount of other evidence tied appellant to Luke's injuries, the error

---

[8] In a footnote, the State suggests that text messages implicate the internet service provider as a third party to the communication, which rebuts the presumption of confidentiality. Appellant consented to Verizon's privacy agreement, which authorizes disclosure of information pursuant to "subpoenas, court orders or search warrants and as otherwise authorized by law."

This Court has not ruled directly on this issue, and neither have most other jurisdictions. The few courts that touch on this concern have not held that service providers compromise otherwise confidential electronic communications. The United States Court of Appeals for the Sixth Circuit held that emailers have a reasonable expectation of privacy even in emails "that are stored with, or sent or received through a commercial [internet service provider]." *United States v. Warshak*, 631 F. 3d 266, 288 (6th Cir. 2010). Other courts have found emails presumptively confidential, thereby not addressing confidential status. *See Reeves v. State*, 664 S.E. 2d 207, 210 (Ga. 2008); *Fire Truck, Inc. v Emergency One, Inc.*, 134 P. 3d 570, 572–75 (Colo. App. 2006). In accord with these opinions, we conclude that Verizon's provision of service does not rebut the confidentiality of appellant's text messages to his wife.

cannot be harmless "unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Mazzone*, 336 Md. at 400, 648 A.2d at 988. In *Mazzone*, the erroneously-admitted communications potentially led the jury to inferences that supported the State's case. *Id.* at 400–01, 648 A.2d at 988. In *State v. Enriquez*, 327 Md. 365, 609 A.2d 343 (1992), a privileged marital communication was introduced "to show a consciousness of guilt." *Id.* at 374, 609 A.2d at 347. Each of these introductions was ruled not harmless.

In this case, the State placed great emphasis on the text messages in the trial. The prosecution devoted fifteen percent of its closing argument to repeating the text messages, and claimed in its rebuttal that "[t]he motive is . . . the triggers[, which] are in the text messages." While motive is not an element of the crimes for which appellant was convicted, a jury may consider motive in evaluating the facts and circumstances of the events. Clearly, the prosecutor thought that motive would assist the jury in evaluating the evidence, as reflected in his closing argument. We cannot say, beyond a reasonable doubt, that the text messages did not contribute to the verdict.

We hold that the inadmissible marital communications were not harmless beyond a reasonable doubt, and constitute reversible error.

**JUDGMENTS OF THE CIRCUIT COURT FOR WORCESTER COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION AND A NEW TRIAL. COSTS TO BE PAID BY WORCESTER COUNTY.**