*State of Maryland v. Kevin Sewell*, No. 20, September Term, 2018, Opinion by Adkins, J.

**EVIDENCE – PRIVILEGES – CONFIDENTIAL MARITAL COMMUNICATIONS – NARROW CONSTRUCTION**: Typically, "privilege statutes are interpreted narrowly," *Bryant v. State*, 393 Md. 196, 202 (2006), because their effect is to exclude otherwise relevant and reliable evidence. We have already determined that the psychotherapist-patient privilege, *id.*; the attorney-client privilege, *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 406 (1998); and the accountant-client privilege, *Sears, Roebuck & Co. v. Gussin*, 350 Md. 552, 562 (1998), should be narrowly construed. Consequently, we hold that the confidential marital communications privilege, too, should be narrowly construed, except to the extent that communications between spouses are presumed to be confidential.

**EVIDENCE – PRIVILEGES – CONFIDENTIAL MARITAL COMMUNICATIONS – CONFIDENTIALITY – TEXT MESSAGES**: Text message communications sent to cell phones can be made confidentially, just as they can fail to be made with a reasonable expectation of confidentiality. There is no presumption that text messages, based on the medium alone, are not confidential communications. Courts must evaluate this on a case-by-case basis. We hold that text messages between spouses, like other marital communications, are presumed to be confidential, unless the party advocating for their admission can establish they were not.

**EVIDENCE – PRIVILEGES – CONFIDENTIAL MARITAL COMMUNICATIONS – REASONABLE EXPECTATION OF CONFIDENTIALITY – REPORTABLE CHILD ABUSE UNDER FL § 5-705**: Under Maryland Code (1987, 2012 Repl. Vol.), § 5-705 of the Family Law Article ("FL"), Marylanders are required to report child abuse, "notwithstanding any other provision of law, including a law on privileged communications." To maintain confidential communication, the communicating spouse must have a reasonable expectation that his or her statements will remain confidential. Because individuals are under a legal duty to report child abuse, statements concerning child abuse cannot be reasonably presumed confidential. Thus, we hold that it is unreasonable for a spouse to assume that a communication made to the other spouse, which he or she has a legal duty to report to third parties, is confidential.

Circuit Court for Worcester County
Case No.: 23-K-15-000516
Argued: October 4, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 20

September Term, 2018

STATE OF MARYLAND

v.

KEVIN SEWELL

Barbera, C.J.
Greene
*Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.
Hotten, J., dissents.

Filed: April 2, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Md. Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

It is a fundamental rule of law that the public has a right to every persons' evidence. There are a small number of constitutional, common-law and statutory exceptions to that general rule, but they have been neither "lightly created nor expansively construed, for they are in derogation of the search for truth."

*Ashford v. State*, 147 Md. App. 1, 63 (2002) (Moylan, J.) (emphasis removed) (quoting *In re Cueto*, 554 F.2d 14, 15 (2d Cir. 1977)). These exceptions are commonly known as privileges. This case asks us to balance the search for truth against one of the strongest privileges—confidential marital communications.

We weigh the introduction of evidence that tends to implicate child abuse against the protection of the confidential marital communications privilege. In so doing, we resolve the two questions presented: (1) whether this Court should adopt a principle of narrow construction with respect to the marital communications privilege, and (2) whether the trial court properly exercised its discretion by allowing the State to introduce text messages that Kevin Sewell sent to his wife's cell phone. As to the first question, we agree with the State that courts should narrowly construe privileges, including the marital communications privilege. As to the second, we affirm the trial court's decision to admit the text messages, although we diverge from its rationale.

## BACKGROUND

### *Factual Overview and Procedural Posture*

Three-year-old Luke Hill lived with his mother, Victoria Harmon, and her fiancé, Nick Miller, in Keller, Virginia. Luke was a happy, healthy little boy who enjoyed running around, playing outside, and driving his toy Jeep. In late April, Luke went to his

pediatrician for a wellness check, and the doctor told his mother that he was "perfectly fine." Approximately one week later, Luke's mother and Nick left Luke in the care of Amanda and Kevin Sewell ("Amanda" and "Kevin," respectively), his aunt and uncle, so that they could enjoy a night out. They arrived at Amanda and Kevin's house in Pocomoke City, Maryland around 3:00 p.m. and visited for a short time, during which Luke and his cousin were running, playing, and wrestling. When Victoria and Nick departed for Salisbury, Kevin was holding Luke.

Kevin played with the boys until around 5:00 p.m. They all ate eggs and bacon for dinner, and afterward, Amanda gave Luke a bath. She testified that during Luke's bath, she noticed, for the first time, that he had "[a] lot" of bruises, including bruising behind his ears, down his neck, on his chest, arms, and legs. He also had black eyes and a knot on his head. Amanda testified that she called Victoria and told her about the bruises behind his ears and that Luke was not feeling well.

Amanda woke up around 5:00 a.m. on Sunday morning, May 3, to get ready for her shift at a nearby restaurant. Luke and his cousin woke shortly thereafter, and Amanda made them breakfast. She departed for work around 6:45 a.m., leaving the children in Kevin's care.

Beginning around 9:00 a.m., Amanda and Kevin sent a series of text messages to each other.[1]

[AMANDA 9:07:22 a.m.]: Everything ok?

---

[1] Some messages have been edited for ease of reading or confidentiality. Substitutions are indicated by brackets. All other text messages appear as they were upon being entered into evidence.

[KEVIN 9:14:15]: Ye boo

[KEVIN 9:14:28]: He doesn't listen worth shit but were fine

[KEVIN 9:14:49]: I think tori told me he [breaks] out from grass

[KEVIN 9:15:02]: I wonder if thats why his neck n chest are broke out

[AMANDA 9:15:48]: His ear is bruised

[KEVIN 9:16:34]: Yeah, it sure [is]

[KEVIN 9:16:47]: [Maybe] him and [Son] were rough housing

[AMANDA 9:33:14]: He's very [skittish]

[KEVIN 9:40:58]: Yeah, he is I've noticed

[KEVIN 9:41:00]: Why, tho

[KEVIN 9:47:55]: He threw up on our sheets

[KEVIN 9:48:24]: [Daughter] was sleeping n he started [screaming] so I [made] him lay down

[KEVIN 9:48:32]: Then he threw up on our bed

[AMANDA 9:53:43]: Nice.

[AMANDA 9:54:23]: Strip the bed and put [what] u can in the washer please

[KEVIN 10:02:27]: Ok

[AMANDA 10:12:49]: Thank u how are u

[KEVIN 10:13:07]: Good boo boo

[AMANDA 10:32:39]: U going with me to take him[ home]

3

[AMANDA 10:41:48]: ?

[AMANDA 11:20:32]: ?

[KEVIN 11:44:12]: I thought u were taking him tomorrow

[KEVIN 12:05:59 p.m.]: [What] time u getting off?

[AMANDA 12:32:19]: Today

[AMANDA 12:32:27]: 1:30

[KEVIN 12:35:39]: Ok

[KEVIN 12:35:53]: Thats fine because he's acting like a fucking asshole

[KEVIN 12:36:20]: He ignores u like hes retarded hes thrown up twice n all he does is whine

[KEVIN 12:36:28]: This is the [last] time

[KEVIN 12:37:21]: The other thing I have been entertained by is him running around saying butt fuck.  He starts clapping n looking for high fives

[AMANDA 12:51:54]: Wtf

[AMANDA 12:53:25]: U going to do the yard while I'm gone?

[AMANDA 12:59:49]: ?

[KEVIN 1:13:57]: Idk [maybe]

[KEVIN 1:14:10]: This has been a day from hell Hes [finally] asleep on our room

[KEVIN 1:14:28]: Please get me a bottle this has been a day from hell

[KEVIN 1:25:00]: Please

[AMANDA 1:31:43]: Ok

4

[AMANDA 1:32:58]: I'll be off round 2

[KEVIN (unspecified time)]: Ok

[KEVIN 2:18:14]: Is it too late for u to get me a shot too

[KEVIN 2:18:23]: If so its fine I can run out

[AMANDA 2:19:12]: I'll give u the money I'm [still] at work

[KEVIN 2:19:12]: Ok

[KEVIN 2:19:16]: I [have] [money]

Amanda testified that when she got home from work on the afternoon of May 3, she went into her bedroom to change and saw Luke covered with a blanket, seemingly asleep. She further stated that without waking Luke, she put a diaper on him, changed his shorts, and Kevin put him in her car. While Amanda was driving Luke home, she and Kevin exchanged the following text messages:

[KEVIN 3:16:16]: Hey I love you be careful

[KEVIN 3:16:45]: Dont tell them o bit him back lol Blame [Son]

[KEVIN 3:17:01]: I didn't even bite him hard but apparently he bruises easy

[AMANDA 3:18:33]: I told her he had bruises so I'll just say they were all ready there.

[AMANDA 3:18:42]: I love u too

[KEVIN (unspecified time)]: Im glad we have a day off together

[KEVIN 3:19:42]: Well he bit the shit out of me

5

[KEVIN 3:19:51]: How else will he learn not to bitw

[KEVIN 3:19:53]: Bite

[AMANDA 3:20:22]: Right

[AMANDA 3:20:33]: I only get on u cause I know u can do better

[KEVIN 3:20:46]: [I'd] be more con[c]erned about all the bruises

When Amanda arrived at her sister's home, Victoria found Luke in a booster seat in the backseat hunched over. He was unresponsive, had a large bump on his head, had a bite mark on his arm, and was making a phlegmy sound while barely breathing. It was later discovered that Luke also had several other bruises. Nick took Luke out of the car, and Victoria called 911. Nick then went to get a neighbor who was an EMT.

Initially, Luke was transported by ambulance to Shore Memorial Hospital in Nassawadox, Virginia but, given the grave nature of his condition, he was promptly transported by helicopter to King's Daughters Hospital in Norfolk, Virginia. Luke was taken into surgery immediately upon arrival. He never regained consciousness. Luke died on Tuesday, May 5, 2015.

Kevin Sewell was charged with (1) first-degree murder, (2) first-degree child abuse, (3) second-degree murder, and (4) neglect of a minor. Amanda Sewell was also charged in the death of Luke, but was granted immunity by the State and compelled to testify.

Before trial, a hearing was held on defense counsel's motion *in limine* to exclude the text messages between Kevin and his wife while Luke was in his care. The basis for the motion was the marital communications privilege. The trial court denied the motion.

During the trial, the State moved into evidence screenshots of the text messages containing timestamps. Over defense counsel's continuing objection, the screenshots of the text messages were received in evidence as a State's exhibit. The text messages were also read into the record in a colloquy between Amanda and the State.

At trial, Dr. Suzanne Starling, the medical director of the child abuse program at the Children's Hospital of the King's Daughters, testified that she examined Luke when he arrived at the hospital. She observed that "he was covered in bruises from head to toe." She noted that Luke had multiple injuries, which included a large bruise on his stomach; bruises on both hips; bruises on his legs, arms, and underneath his armpit; several injuries across his chest; and "a very large bruise from his forehead up into his hair." On the left side of his face, he had a small cut underneath his eye, bruising on the front of his cheek, bruising across his jawbone, bruising inside his ear, bruising underneath his chin, and several bruises around his neck. Starling testified that Luke had similar injuries to the right side of his face. These injuries included "bruises all around his hairline, bruises all in front of his ear, and his right ear [was] really significantly bruised inside, and even swollen around the outside, and the bruises extend[ed] all the way down from his jawbone onto his neck." In addition, Luke "had a very large bite mark on his right shoulder," a bite mark on his left shoulder, and a bite mark on his left forearm. The doctor also testified that "the skin from the base of [Luke's] penis to the tip of his penis [had] been removed." Starling opined, with a reasonable degree of medical certainty, that "the bruises were inflicted," meaning "they didn't occur by accident." She determined that "a blow to the abdomen caused [Luke] to have abdomen trauma," and that he sustained abusive head trauma.

7

Starling concluded that the fatal injury did not occur until after breakfast on Sunday, May 3. She explained that Luke "would not be expected to eat normally" due to the severity of his head injury and abdominal trauma, and the "fact that he was able to sit up and eat breakfast demonstrates that he had not received his fatal injury at that time." Starling testified that Luke was "clearly significantly injured at the time that he lost consciousness later in the morning."

After Luke's death, Dr. Wendy Gunther performed an autopsy. At trial, Gunther testified that Luke sustained a minimum of 40 to 50 injuries, and that his brain was still in the process of swelling when she performed the autopsy. Based on her observations, Gunther concluded, to a reasonable degree of medical certainty, that Luke died from "shaken/slam syndrome with many other injuries contributing." She explained that when "a child is shaken, or shaken and slammed, their brain is injured," and when the brain sustains an injury, it swells. Gunther concluded that someone punched or hit Luke on the top of his head causing "direct blunt trauma to his head." She also observed that many of the injuries were "control injuries," which occur "anyplace where a person's hands would naturally fall when grabbing a child to control it," such as the arms, legs, stomach, and hip. Like Starling, Gunther testified that Luke's injuries were recently inflicted, as they did not "look like they[ were] starting to heal."

Kevin Sewell was convicted of first-degree murder, first-degree child abuse, and neglect of a minor child. Sewell timely appealed to the Court of Special Appeals. In a reported decision, *Sewell v. State*, 236 Md. App. 96, 114 (2018), the intermediate appellate court ruled that the text messages between Sewell and his wife were marital

8

communications and, as such, it was incumbent upon the State to rebut that presumption of confidentiality. Concluding that the State failed to do so, it held that the trial court abused its discretion in admitting the text messages, and it remanded the case for a new trial. *Id.* at 115–16. We granted the State's petition for a writ of certiorari.

## DISCUSSION

*Confidential Marital Communications Privilege*

Subject to limited exceptions, "[l]itigants and their spouses are competent and compellable to give evidence." *See* Md. Code (1973, 2013 Repl. Vol.), § 9-101(2) of the Courts and Judicial Proceedings Article ("CJP"). There are two distinct marital privileges: the first, protecting confidential marital communications, and the second, privileging adverse spousal testimony. Here, the confidential marital communications privilege is at issue. In Maryland, this privilege is codified at CJP § 9-105, "Confidential communications occurring during marriage." This section provides that "[o]ne spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage." *Id.* The privilege is available in both civil and criminal trials and may be invoked by either spouse. *See* Joseph F. Murphy, Jr., *Maryland Evidence Handbook*, § 903(B) at 445–46 (4th ed. 2010).

The State contends that a "conflict" exists among the Court of Special Appeals' decisions and that we should resolve it by holding that the marital communication privilege must be narrowly construed. Regarding the confidential marital communications privilege, the State asserts that, to the extent that it has been construed in the past, this Court has been too "liberal" and untethered the privilege from its original purpose—to preserve and

9

promote marital and family harmony. All testimonial privileges, the State contends, should be disfavored and narrowly construed. Sewell, on the other hand, sees no conflict to resolve. Instead, Sewell characterizes all past case law as broadly interpreting the marital communications privilege and recognizing few, if any, exceptions.

Typically, "privilege statutes are interpreted narrowly." *Bryant v. State*, 393 Md. 196, 202 (2006) (citations omitted). *See also* Murphy, *Maryland Evidence Handbook*, § 900 at 422 ("It is obvious that evidence excluded on grounds of privilege increases the danger of an incorrect verdict. The privilege laws are therefore given a narrow, strict construction."); 6 Lynn McLain, *Maryland Evidence: State and Federal*, § 501:1 at 6 (3d ed. 2013) ("[P]rivileges are strictly construed, because they exclude relevant, reliable evidence."); 1 Kenneth S. Brown, *McCormick on Evidence*, § 74 at 474 (7th ed. 2013) ("Since privileges operate to deny litigants access to every person's evidence, the courts have generally construed them no more broadly than necessary to accomplish their basic purposes."). We have stated as much in cases involving the psychotherapist-patient privilege, *Bryant*, 393 Md. at 202; the attorney-client privilege, *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 406 (1998); and the accountant-client privilege, *Sears, Roebuck & Co. v. Gussin*, 350 Md. 552, 562 (1998).

We have not explicitly announced a narrow interpretation of CJP § 9-105, but we have interpreted the statute and discerned that the General Assembly intended certain limitations on what communications qualified for the marital privilege:

> The policy reasons underlying the privilege for confidential communications between husband and wife are (1) that the communications originate in confidence, (2) the confidence is

10

essential to the relation, (3) the relation is a proper object of encouragement by the law, and (4) the injury that would inure to it by the disclosure is probably greater than the benefit that would result in the judicial investigation of truth.

*Coleman v. State*, 281 Md. 538, 541 (1977) (citing 8 Wigmore, *Evidence*, § 2332 (McNaughton rev. 1961)). *See also* 1 Brown, *McCormick on Evidence*, § 80 at 507 (most courts "read into [marital communications privilege statutes] the requirement of confidentiality").

We reinforced the importance of confidentiality in assessing whether a given communication to a spouse was within the privilege: "The essence of the privilege is to protect confidences only, . . . and thereby encourage such communications free from fear of compulsory disclosure, thus promoting marital harmony." *Id*. (citing 8 Wigmore, *Evidence*, § 2332; and McCormick, *Handbook of the Law of Evidence*, § 86 (2d ed. 1972)).

To narrowly construe a privilege, however, simply means that courts must not endeavor to overread its applicability and resolve ambiguities in favor of admitting evidence. *See Ashford*, 147 Md. App. at 70. In Maryland, any party resisting discovery by asserting a privilege "bears the burden of establishing its existence and applicability" and must "substantiate its non-discovery" by a preponderance of the evidence. *Forma–Pack*, 351 Md. at 406, 409 (applying attorney-client privilege). The confidential marital communications privilege requires: (1) a communication; (2) that the couple was married at the time of the communication; and (3) that the communication was intended to be confidential. *See* CJP § 9-105.

The parties agree that the first two showings have been made, but they disagree about whether the communication was confidential, on two grounds. First, the parties dispute which party bears the burden of establishing that a communication was confidential—i.e., whether marital communications are presumed confidential. Second, they disagree about whether the specific text message communications at issue were, in fact, demonstrated to be confidential.

We have recognized that communications between spouses are considered confidential when: (1) "expressly made so"; or (2) "the subject is such that the communicating spouse would probably desire that the matter be kept secret, either because its disclosure would be embarrassing or for some other reason." *Coleman*, 281 Md. at 542 (citation omitted). The *Coleman* Court cited, with approval, language from the Court of Appeals of New York indicating that the privilege is "designed to protect and strengthen the marital bond" and, thus, "encompasses only those statements . . . induced by the marital relation . . . ." *Id.*

Sewell contends that this Court presumes marital communications to be confidential, unless presented with evidence to the contrary, citing *State v. Enriquez*, 327 Md. 365, 372 (1992). The State, on the other hand, emphasizes that any presumption of confidentiality is a judicial creation and, thus, encourages the Court to constrain this presumption, to the extent that one exists. The State argues that Maryland is "not so much at the tip of the spear, as at the back of the line" when it comes to a progressive interpretation of the confidential marital communications privilege.

12

"Generally, the courts have presumed that communications between husband and wife are confidential and privileged, although the circumstances of a given case can negate this presumption." *Coleman*, 281 Md. at 543 (citations omitted). We reasserted this presumption in *Enriquez*, 327 Md. at 372, stating clearly that "there is a rebuttable presumption that marital communications are confidential and privileged. The presumption is rebutted . . . where it is shown that the communication was not intended to be confidential." The State recognizes this history, but asks us to modify our approach to this privilege.

It is our practice to avoid unnecessarily "making shipwreck" of well-settled precedent. *See Boyd v. Parker*, 43 Md. 182, 201 (1875). And we think wreckage is not necessary here. Rather we rely on settled law that the presumption of confidentiality can be rebutted by showing that the communication was made with the reasonable expectation that a third party would learn of it. *See Gutridge v. State*, 236 Md. 514, 516 (1964) ("The message sought to be sent to the appellant's wife through another cannot be regarded as confidential."). We also consider precedent from the Court of Special Appeals allowing rebuttal of the presumption when the party supporting admission could show that the statement was not induced by the marital relation. *See Harris v. State*, 37 Md. App. 180, 184 (1977). We have never attempted to identify all possible avenues to rebut this presumption, and today we consider a new one.

*Confidentiality of Text Message Communications*

The State makes various general and policy-based arguments to support the view that testimonial privileges, including marital communications, should be narrowly

construed because "the fundamental objective of a trial is the ascertainment of the truth . . . through the introduction of relevant evidence[.]" This theme permeates the State's more specific arguments. We consider two theories advanced by the State to demonstrate rebuttal of the presumption of confidentiality for marital communications, which we discuss below.[2] Sewell, in response, focuses on the presumption of confidentiality, and asserts that a waiver of the confidential marital communications privilege "will only be found in the clearest of circumstances."

### (i) Wong-Wing v. State

First, the State asks us to extend the Court of Special Appeals' reasoning in *Wong-Wing v. State*, 156 Md. App. 597, 610 (2004), and conclude that Sewell and his wife had "no reasonable expectation of confidentiality" when they communicated via text message. Sewell, responding, sees *Wong-Wing* as presenting entirely different circumstances—the relevant communication being a message left on a telephone answering device located in a shared living space—and disagrees that the presumption has been rebutted.

*Wong-Wing* involved a defendant-husband ("Wong-Wing") accused of sexually abusing his then-wife's ("Sherry") daughter. *See id.* at 602. After he was confronted about this sexual abuse, Wong-Wing left multiple messages on an answering machine located in Sherry's home. *See id.* at 603. He addressed the messages to his wife, beginning each with the word "Sherry." *Id.* The messages stated that Wong-Wing did not "want to hear anything that happened before," knew he caused "a lot of pain and grief," was "sorry" for

---

[2] The State offers these theories without conceding the existence of a presumption of confidentiality.

14

all he caused, and did not "feel like living anymore." *Id.* The trial court overruled Wong-Wing's objection and admitted the recording transcripts. *See id.* at 605.

The Court of Special Appeals agreed with the trial court's decision and held that admission of the messages did not violate CJP § 9-105. *Id.* at 610. The intermediate appellate court observed that Wong-Wing left his messages "on an answering machine in a home that he knew [Sherry] shared with her adolescent daughter and her mother" and that all family members "moved freely between the two living spaces." *Id.* at 609. Accordingly, Wong-Wing "ran the risk" that others could have overheard or retrieved the message and had no reasonable expectation of confidentiality. *Id.* at 610. Thus, the State demonstrated that the circumstances surrounding Wong-Wing's communication destroyed his expectation of confidentiality—knowing that multiple individuals had access to the answering machine, he chose to leave his message there anyway. We agree with the Court of Special Appeals that evidence about Sherry's living arrangements rebutted the presumption of confidentiality. For Wong-Wing to trust that these messages would be confidential simply was not reasonable.

The State would have us extend this rationale to encompass text messages generally, including the ones at issue here. It focuses on the *Wong-Wing* court's reasoning that "[e]ven if there were any ambiguity, 'the disfavor with which the law looks on testimonial privileges dictates that we resolve an ambiguity against the privilege, rather than in its favor.'" Praising the *Wong-Wing* rationale, the State asserts: "The merit of the approach taken in *Wong-Wing* is that it imposes a reasonable and pragmatic limitation on an otherwise boundless presumption of entitlement to a policy-based privilege that itself was

15

never intended to be boundless." It further advances that "[i]f a spouse chooses to communicate in a manner that assumes a practical risk that someone other than the intended recipient could retrieve the message, there is no logical basis for 'presuming' that the person intended for the communication to be confidential[.]"

We are not in lock-step with the State's view of text messages. We agree, rather, with Sewell that the circumstances in *Wong-Wing* differ from those in this case. We see a substantial difference between traditional answering machines (prevalent before cell phones) and the text messaging capabilities of modern cell phones. Because cell phones are so small, they are highly portable, and can be easily carried in a pocket or purse. Conceivable scenarios exist wherein a party could reasonably believe a text message to be confidential, just as scenarios exist wherein this assumption would not be reasonable. Thus, it would be unwise to presume that text messages themselves can never be confidential. Again, it was the State's responsibility to make a demonstration one way or the other.

### *(ii) Confidentiality of Matters the Spouse is Mandated to Report*

In the alternative, the State focuses on the nature of the crime—arguing that "every federal circuit court to have ever considered the issue has interpreted an exception to the corresponding federal privilege in cases of, *inter alia*, child abuse," and citing cases from multiple federal jurisdictions. It emphasizes that "child abuse occurs most often in the home at the hands of a parent or parent-substitute. Testimony regarding confidential marital communications may constitute critical evidence in such cases." *United States v.*

*Breton*, 740 F.3d 1, 11 (1st Cir. 2014). It continues, "Several states, and the District of Columbia, recognize a similar exception by court rule or statute."

Maryland, the State asserts, has also legislatively recognized an exception concerning child abuse, citing Maryland Code (1987, 2012 Repl. Vol.), § 5-705(a)(1) of the Family Law Article ("FL"). This requires that "notwithstanding any other provision of law, including a law on privileged communications" any person in Maryland "who has reason to believe that a child has been subjected to abuse or neglect **shall** notify the local [Department of Social Services] or the appropriate law enforcement agency."[3] *Id.* (emphasis added). The State sees the Family Law Article as "reflect[ing] a legislative determination that preserving marital harmony, though a legitimate value in its own right, is not predominant over society's interest in identifying and prosecuting the abuse of children in Maryland." It submits that Sewell had no reasonable expectation of confidentiality when he communicated something his wife had a statutory duty to disclose.

Sewell, although not specifically addressing FL § 5-705 in his brief, generally responds that the marital communications privilege applies, even when made in furtherance of a crime, citing *State v. Mazzone*, 336 Md. 379 (1994). During oral arguments, Sewell seemed to suggest that, were the General Assembly intending that marital communications

---

[3] Reports made under this section are encouraged, "to the extent possible," Maryland Code (1987, 2012 Repl. Vol.), § 5-705(d)(1) of the Family Law Article ("FL"), to include all information specified in FL § 5-704(c)—the name, age, and address of the child and responsible parent; the whereabouts of the child; the nature, extent, and possible previous incidents of child abuse or neglect; and any information "that would help to determine" the cause of and the individual responsible for the abuse or neglect.

17

regarding child abuse or neglect be exempted from the marital privilege, it would have done so in the Courts and Judicial Proceedings Article, not the Family Law Article.

There are few matters our State takes more seriously than child abuse. Thus, we examine carefully the impact of FL § 5-705 on the marital communications privilege, especially in light of the General Assembly's explicitly broad statement of application— "notwithstanding any other provision of law." Mandatory reporting for suspected child abuse has existed for some time, but it was previously only a requirement for health practitioners, police officers, educators, and human service workers. *See id.* § 5-704(a). In 1987, the General Assembly expanded this child protective statute by adding § 5-705— imposing a child abuse reporting obligation on the general public. *See* 1987 Md. Laws ch. 635 at 2948.

The original statute applied, notwithstanding "any law on privileged communications . . . ." *Id.* But in its first amendment thereto, the General Assembly specifically exempted knowledge gained through the attorney-client and priest-penitent privileges. *See* 1988 Md. Laws ch. 769 at 5021. Knowledge gained through the confidential marital communications privilege, however, has not been exempted, and thus a spouse, notwithstanding the privilege, is obligated to report suspected child abuse.

In evaluating a privilege claim, we consider whether the information could "reasonably be expected to remain confidential." *Forma–Pack*, 351 Md. at 416–17 (citations omitted). One method of destroying a reasonable expectation of confidentiality is through disclosure to a third party. "Disclosure to one's spouse with the intent that the spouse reveal one's communication to a third party, outside any other privileged

18

relationship such as attorney-client, also will negate the privilege." 6 McLain, *Maryland Evidence State and Federal*, § 505:2 at 203. The question, here, is what to do when one spouse is mandated to disclose certain information to a third party upon hearing it, notwithstanding the confidential marital communications privilege.

We have not so far been presented with a case involving a privilege claim competing with a mandatory disclosure obligation. But we consider relevant our cases dealing with third party disclosure. Among our first of these was *Master v. Master*, 223 Md. 618 (1960), involving a husband who sought to bar his wife's testimony as to statements he made claiming to have paid his taxes. *See id.* at 623. The husband alleged that these statements were protected by the confidential marital communications privilege. *See id.* Nonetheless, we determined that, because the statements were "made in the presence of children old enough to understand fully what was being said," they were not confidential. *Id.* We concluded that confidential communications do not include those made "in the hearing of third persons," and that these statements "may be testified to by husband or wife." *Id.* at 624.

Maryland courts have continually reaffirmed that third party disclosure, and reasonable expectation of third party disclosure, are quintessential situations negating any reasonable expectation of confidentiality. *See, e.g.*, *Coleman*, 281 Md. at 543 ("[T]he fact that a husband knew that his wife was unable to read without the assistance of a third party would rebut the presumption that a letter which he sent to her was intended to be confidential.") (citation omitted); *Gutridge v. State*, 236 Md. 514, 516 (1964) ("The message sought to be sent to the appellant's wife through another cannot be regarded as

19

confidential."); *Matthews v. State*, 89 Md. App. 488, 502 (1991) ("If the communication is made with the contemplation or expectation that a third party will learn of it, the confidential communication privilege does not apply.") (citation omitted); *Mulligan v. State*, 6 Md. App. 600, 615 (1969) ("The admission made by the appellant to his wife in the presence of the police when he saw her in the room in the police station was not a confidential communication . . . .").

In *Coleman* we reviewed whether a wife could disclose statements her husband made to her regarding the location of a ring that he had stolen from a woman he was alleged to have raped. 281 Md. at 540. The husband asked his wife to retrieve the ring from another woman who had access to his apartment and, at his request, had hidden the ring. *Id.* Disagreeing with the Court of Special Appeals' holding that the husband knew his communication would be disclosed to a third person, we concluded that the husband "did not suggest that his wife disclose his communication to a third party, **nor did the circumstances require a disclosure**." *Id.* at 544 (emphasis added). We held that the statements remained confidential and privileged. *See id.*

*Coleman* may represent the outer reaches of the confidential marital communications privilege. It is also readily distinguished from the present case. Retrieving a ring from a third party is not a circumstance requiring disclosure because the task could have been carried out without revealing the husband's communication. Further, unlike the child abuse reporting statute, no law requires disclosure of all known or suspected illegal activity to law enforcement. Because it is reasonable to expect that a

20

spouse will not betray the other spouse's marital trust, the communication remains encased in its confidential patina.

But the tipping point is reached when the privilege is asserted with respect to information the other spouse is under a legal duty to disclose to law enforcement.[4] Amanda Sewell, like all Marylanders, owed a legal duty to make a report if she had any "reason to believe" that a child was the victim of abuse or neglect, "**notwithstanding any other provision of law**." FL § 5-705(a)(1) (emphasis added). We hold that the phrase "notwithstanding any other provision of law" in this section includes the confidential marital communications privilege. Kevin Sewell, like all Marylanders, is "presumed to know the law," irrespective of his subjective understanding. *Benik v. Hatcher*, 358 Md. 507, 532 (2000). When Kevin discussed matters that he knew (or should have known) Amanda had an affirmative duty to report to a third party, he no longer retained a colorable claim that the communications were "reasonably expected" to remain confidential.

It is not material that Amanda did not, in fact, make a report. Rather, the focus is on what Kevin could reasonably expect. Thus, we agree with the State that, in such a circumstance, such communication is not confidential, and therefore not excluded by CJP § 9-105, the confidential marital communications privilege.

---

[4] Sewell's potential ignorance of the law is no excuse. "[E]veryone is 'presumed to know the law regardless of conscious knowledge or lack thereof, and are presumed to intend the necessary and legitimate consequences of their actions in its light.'" *Benik v. Hatcher*, 358 Md. 507, 532 (2000) (citation omitted). There are some instances where the General Assembly has determined that such a presumption is inappropriate, like when the Legislature requires notice. *See Hughes v. Moyer*, 452 Md. 77, 98 (2017). But this is not such a circumstance.

21

Our decision is reinforced when we consider the relative dates of enactment of FL § 5-705 and CJP § 9-105. We have stated that "if two statutes contain an irreconcilable conflict, the statute whose relevant substantive provisions were enacted most recently may impliedly repeal any conflicting provision of the earlier statute." *Atkinson v. Anne Arundel Cty.*, 428 Md. 723, 743 (2012) (citation omitted). To the degree that the present statutes are in conflict—and we need not decide whether there is an "irreconcilable conflict" here— FL § 5-705 would control the Court's reading in this instance. The confidential marital communications privilege has existed, in some fashion, since 1864. *See* 1864 Md. Laws ch. 109 at 137. The mandated reporting requirement, as discussed earlier, was not enacted until 1987. Thus, were these statutes in conflict, we would presume that the General Assembly knew the language of CJP § 9-105 and passed the reporting statute with the intention that it control.

Excluding statements regarding child abuse from the realm of "confidential" marital communications is also sensible policy aligned with the privilege's purpose. The confidential marital communications privilege cannot be a safe harbor for abuse and predation—excluding the invaluable testimony of one of the only likely witnesses to such intimate crime against such vulnerable victims.[5] "The argument traditionally advanced in

---

[5] We have employed such a rationale before. In *Brown v. State*, 359 Md. 180, 192 (2000), we observed the existence of a significant exception to the common law marital privileges—"from the earliest time, a wife was permitted to testify against her husband when she was the victim of his criminal conduct." The rationale behind this exception is to prevent the "perversion" of allowing a husband who commits a crime against his wife to then quash her testimony by asserting privilege, as she is often the only one able to testify against him. *Id.* This statement affirms the position we took in *State v. Enriquez*, 327 Md. 365, 369 n.1 (1992), providing that, "[c]learly, crimes against the other spouse are not

22

support of the marital communications privilege is that the privilege is needed to encourage marital confidences, which confidences in turn promote harmony between husband and wife." 1 Brown, *McCormick on Evidence*, § 86 at 523. Therefore, offenses against a "spouse, child, or cohabitant . . . most strongly implicate the policy that justifies the creation" of an exception to the marital communication privilege. 6C–13 Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence, Evidentiary Privileges*, § 6.13.5 at 1467–68. Such offenses "imperil the family unit," and thus undermine the overarching rationale for the privilege.[6] *Id.*

In sum, we hold that when one spouse communicates information to the other spouse that the other spouse is under a statutory duty to disclose, any reasonable expectation of confidentiality is destroyed. Consequently, this communication is not confidential, and not protected by the confidential marital communications privilege. To reach any other conclusion would be to sanction ignorance of the law and mock the principal basis for the confidential marital communications privilege, in the first instance.

---

privileged." How far this rationale extends beyond crimes against the spouse, we stated, was "not clear." *Brown*, 359 Md. at 192 n.4.

[6] Modern explanations for the confidential marital communications privilege revolve around more "humanistic considerations." 1 Kenneth S. Brown, *McCormick on Evidence*, § 86 at 524 (7th ed. 2013). "It is a matter of emotion and sentiment. All of us have feelings of indelicacy and want of decorum in prying into the secrets of husband and wife." *Id.* at 525. Protection against disclosure of communications revealing child abuse within the home is also at odds with this more "humanistic" rationale.

Yet, our interpretation of these competing statutes does not fully answer the question as to whether the trial court abused its discretion by allowing the text messages into evidence in this case.

*Sewell's Text Messages to His Wife*

We do not agree with the trial court that the text message communications should have been admitted on the grounds that the marital privilege did not apply because the text message medium itself could not reasonably be considered confidential. As we said before, text messaging is a platform capable of confidential use.

But the texts were nonetheless admissible under the circumstances here. The texts are not shielded by marital privilege because they consisted of information that Amanda had an affirmative legal duty to report to authorities—Kevin could not reasonably expect they would be confidential.[7] It is worth repeating the specifics of this statutory duty, beginning with the obligation of all Marylanders with "reason to believe" that a child is the victim of abuse to "notify the local department or the appropriate law enforcement agency." FL § 5-705(a)(1). A report of abuse made pursuant to FL § 5-705(a) "may be oral or in writing," *id.* § 5-705(c), and "shall include," to the extent possible, "the information required by [FL] § 5-704(c)," *id.* § 5-705(d)(1). This includes the name, age, and address of the child and responsible parent; the whereabouts of the child; the nature, extent, and

---

[7] It is of no moment that the trial court used a different rationale. We have, on numerous occasions, stated that "where the record in a case adequately demonstrates that the decision of the trial court was correct, although on a ground not relied upon by the trial court and perhaps not even raised by the parties, an appellate court will affirm." *Robeson v. State*, 285 Md. 498, 502 (1979) (emphasis omitted).

24

possible previous incidents of child abuse or neglect; and any other information "that would help to determine" the cause of and the individual responsible for the abuse or neglect. *Id.* § 5-704(c).

Amanda observed many bruises on Luke's body after dinner on Saturday, as well as a knot on his head—enough to cause her to call his mother. On Sunday at 9:07 a.m., after Amanda had been at work for a couple of hours, she texted Kevin to see if "everything [was] ok." A series of messages followed, during which Kevin complained that Luke "doesn't listen worth shit," was "acting like a f---ing asshole," had vomited, and that it had been a "day from hell." After work, Amanda changed Luke's diaper after the skin from the base of Luke's penis to the tip of his penis had been removed, and discovered that Luke had large bitemarks on his body. It is palpable that, by the time Amanda placed Luke in her car to take him back to his parents—and very likely before that—she possessed the requisite "reason to believe" that Luke had been the victim of child abuse at the hands of her husband, and knew that her husband had bitten the child causing the marks. Amanda's awareness of the severity of the abuse is evident in the couple's effort to conceal the source of Luke's injuries from Luke's parents. Indeed, the text messages indicate that Amanda had to "get on" Kevin before about similar behavior.

The injuries were so severe that, upon seeing her child, Luke's mother immediately realized he was in grave danger—he was unresponsive, covered in bruises, and "making a phlegmy sound" while barely breathing. Under these circumstances, no reasonable person could miss the abuse. Thus, Amanda was mandated to report this information, and by law,

25

none of her husband's text messages relating to the time during which Luke was in his care were confidential.

Information or circumstances giving rise to a reportable incident of child abuse need not be found in each individual communication to be admissible. *See, e.g.*, *Utah v. Widdison*, 4 P.3d 100, 111 n.9 (Utah Ct. App. 2000) (recounting the testimony from a wife concerning statements by her former husband that gave rise to suspected child abuse and were admitted over an objection invoking the confidential marital communications privilege). Reporting can be cumulative. For example, some suspicions of abuse are built up over time—e.g., from ongoing conversations and experience with a child or their suspected abuser—while others are gained instantaneously—e.g., seeing a child with injuries clearly suggesting abuse. Regardless, once a mandated reporter possesses the necessary "reason to believe" that a child has been the victim of abuse, **any** information "that would help to determine" the individual suspected of the abuse and the circumstances surrounding that suspicion **shall** be revealed, "notwithstanding any other provision of law, including a law on privileged communications," FL §§ 5-704(c), 5-705(a)(1).

Accordingly, Amanda was obligated by law to report the suspected abuse, including each text message quoted in this opinion. They were not protected by the confidential marital communications privilege because it was not reasonable for Kevin to believe that his text message communications were confidential when they pertained to child abuse and must be disclosed. It matters not whether Kevin thought they were confidential at the time he sent them. A court performs an objective analysis, and based on such, clearly the privilege does not attach to communications relating to child abuse. The entire collection

26

of text messages relate to Kevin's actions that day as caretaker for the children, and therefore, they were admissible against him for all charges relating to and stemming from child abuse.[8]

### CONCLUSION

We hold that courts should continue to narrowly construe all privileges. Even so, the confidential marital communications privilege contains a rebuttable presumption of confidentiality once other elements are established. Further, text messages, like other marital communications, are presumed to be confidential, unless the party advocating for their admission can establish that they were not. Finally, we hold that it is unreasonable for a spouse to assume that communication made to the other spouse, which the latter has a legal duty to report to law enforcement, is confidential.

The text messages in this case were properly admitted against Respondent. For the reasons stated herein, we reverse the judgment of the Court of Special Appeals and remand the case to that Court with instructions to affirm the judgment of the Circuit Court for Worcester County.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**

---

[8] Kevin Sewell was charged with and convicted of first-degree murder, first-degree child abuse, and neglect of a minor child. Each of these charges possesses the necessary relation to child abuse to warrant admissibility of the text messages.

27

Circuit Court for Worcester County
Case No. 23-K-15-000516
Argued: October 4, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 20

September Term, 2018

_____

STATE OF MARYLAND

v.

KEVIN SEWELL

_____

Barbera, C.J.,
Greene,
*Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Dissenting Opinion by Hotten, J.

_____

Filed: April 2, 2019

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the MD. Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Respectfully, I dissent and would affirm the judgment of the Court of Special Appeals.

On appeal, the State presented two issues for our review:

1. Should this Court apply a principle of narrow construction to the marital communications privilege?
2. Did the trial court properly exercise its discretion by allowing the State to introduce text messages that Respondent sent to his wife's cell phone?

As to the first issue, the Majority contends that Maryland Code, Family Law Article ("Fam. Law") § 5-705(a)(1) rebuts the presumption of confidentiality that arose between Respondent Kevin Sewell ("Sewell") and his wife, Amanda Sewell ("Amanda"). According to the Majority, "[w]hen [Sewell] discussed matters that he knew (or should have known) Amanda had an affirmative duty to report to a third party, he no longer retained a colorable claim that the communications were 'reasonably expected' to remain confidential." *Slip op.* at 21.

In this regard, the Majority departs from settled case law. Though we have narrowly construed other privileges, we have not adopted a principle of narrow construction to marital communications. *See e.g.*, *State v. Mazzone*, 336 Md. 379, 648 A.2d 978 (1994); *State v. Enriquez*, 327 Md. 365, 609 A.2d 343 (1992); *Coleman v. State*, 281 Md. 538, 380 A.2d 49 (1977), discussed *infra*.

**STATUTORY AUTHORITY**

As the Majority provides, "[t]here are two distinct marital privileges: the first, protecting marital communication [("marital communications privilege")], and the second, privileging adverse spousal testimony [("adverse spousal testimony privilege")]. Here, the

marital communications privilege is at issue." *Slip op.* at 9. The marital communications privilege is codified in Maryland Code, Courts and Judicial Proceedings Article ("Cts. & Jud. Proc.") § 9-105 and states that "[o]ne spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage." The adverse spousal testimony privilege is codified in Cts. & Jud. Proc. § 9-106 and **explicitly contemplates** that the privilege will not apply in cases of child abuse. The statute reads, in relevant part:

> (a) The spouse of a person on trial for a crime may not be compelled to testify as an adverse witness **unless the charge involves:**
> **(1) The abuse of a child under 18[.]**

(emphasis added). Cts. & Jud. Proc. § 9-106 clearly provides an exception to the privilege, and is evidence that the General Assembly could have written an exception into Cts. & Jud. Proc. § 9-105, had it wanted to do so. Instead, the Majority contends that a **separate** Article of the Maryland Code, the Family Law Article, should guide our interpretation of Cts. & Jud. Proc. § 9-105.

When contrasted against one another, the statutory text of Cts. & Jud. Proc. §§ 9-105 and 9-106 provides evidence that the marital communications privilege is construed more broadly than its counterpart. An analysis of our case law also reveals that the marital communications privilege has been interpreted more broadly relative to our interpretation of other evidentiary privileges.

## CASE PRECEDENT

In *Ashford v. State*, 147 Md.App. 1, 65, 807 A.2d 732, 769 (2002), the Court of Special Appeals emphasized that testimonial privileges are disfavored because they operate

2

in opposition to the truth-seeking function of a trial. However, this Court has consistently applied a more liberal construction to the privilege of confidential marital communications, as demonstrated with its precedent in *State v. Mazzone*, 336 Md. 379, 648 A.2d 978 (1994); *State v. Enriquez*, 327 Md. 365, 609 A.2d 343 (1992); and *Coleman v. State*, 281 Md. 538, 380 A.2d 49 (1977).

In *Coleman*, this Court held that a husband's call to his wife, in which he directed her to conceal evidence of his crime, constituted a confidential conversation protected by privilege. 281 Md. at 544-45, 380 A.2d at 53-54. This Court's holding clarified the scope of Cts. & Jud. Proc. § 9-105, holding that confidential communications between spouses are privileged, even if the communication is in furtherance of a crime. *Id.* at 545, 380 A.2d at 54. In *Coleman*, the Court established that "[c]ommunications between husband and wife occurring during the marriage are deemed confidential if expressly made so, or if the subject is such that the communicating spouse would probably desire that the matter be kept secret, either because its disclosure would be embarrassing or for some other reason." *Id.* at 542, 380 A.2d at 52. The assertion that communications are confidential if so desired by spouses provides for a liberal construction of the spousal privilege.

The Majority writes that *Coleman* "may represent the outer reaches of the confidential marital communications privilege." *Slip op.* at 20. I fail to discern how *Coleman* does not represent this Court's liberal interpretation of the privilege. There is nothing directly in the relevant statutory text (*see supra*) that enables us to construe the privilege as applying to crimes, but lacking in application to child abuse.

3

In *Enriquez*, this Court held that the trial court had improperly admitted Petitioner's telephone conversation with his wife. 327 Md. at 373, 609 A.2d at 346. During the conversation, Petitioner apologized for his alleged sexual assault on his wife and claimed that he was in a treatment center. *Id.* at 369, 609 A.2d at 344. We applied a liberal construction to the privilege of marital communications, maintaining our assertion that no exceptions apply to the privilege—whether for communications pertaining to the furtherance of a crime (*Coleman*) or for prosecutions of one spouse against the other. *Enriquez*, akin to *Coleman*, reasserted this Court's rejection of a narrow construction to the privilege of marital communications and the presumption of confidentiality.

The State asserts that the liberal construction of the marital communications privilege has exceeded the scope of the policy rationale for the privilege. In *Coleman*, this Court explained the policy reasons for the statutory marital communications privilege, namely:

> (1) that the communications originate in confidence, (2) the confidence is essential to the relation, (3) the relation is a proper object of encouragement by the law, and (4) the injury that would inure to it by the disclosure is probably greater than the benefit that would result in the judicial investigation of the truth.

281 Md. at 541, 380 A.2d at 51-52. The State claims that both *Coleman* and *Enriquez* have resulted in precedent that "is now wholly untethered" to the Court's policy rationale. However, in *Enriquez*, this Court explained that the General Assembly had not amended Cts. & Jud. Proc. § 9-105, nor had it taken action to add express exceptions to § 9-105 since

4

*Coleman* was decided.[1]  Md. 365 at 373, A.2d at 346.  As such, this Court concluded that the legislature "intended that [this Court's] interpretation of the statute in *Coleman* should obtain."  *Id.*  This Court's precedent and interpretation of legislative intent have consistently emphasized a liberal interpretation of the marital communications privilege that is codified in Cts. & Jud. Proc. § 9-105.

In *State v. Mazzone*, 336 Md. 379, 648 A.2d 978, this Court held that the Maryland Wiretapping and Electronic Surveillance Act preserved the marital communications privilege if interception of these communications was not minimized and reasonable. Mazzone was convicted of conspiracy to violate controlled dangerous substance laws but appealed his conviction based on the introduction of alleged confidential communications with his wife that had been intercepted through a wiretap.  *Id.* at 381, 648 A.2d at 979. This Court analyzed the Court of Special Appeals reversal, noting that the Court of Special Appeals "explor[ed] the policy behind the privilege statute, rather than the words of the statute."  *Id.* at 389, 648 A.2d at 982.  This Court emphasized the necessity in considering the statutory construction and plain language of Cts. & Jud. Proc. § 9-105 in order to properly "surmise legislative intention[.]"  *Id.*  In exploring legislative intent, this Court analyzed § 9-105 in conjunction with § 10-407 of the wiretapping statute, concluding "that

---

[1] In proclaiming that there are no exceptions to Cts. & Jud. Proc. § 9-105, this Court "held that the legislature recognized the need for . . . express exception[s] for a statutory privilege protecting certain communications [including those] between accountant and their clients, and between psychiatrists or psychologists and their patients.  *See* § 9-110 and § 9-109 of the Courts Article, respectively."  *Enriquez*, 327 Md. at 372-73, 609 A.2d at 346.  Note that these express exceptions are codified in the Cts. & Jud. Proc. Article, where the marital communications privilege also exists.

privileged communications remain privileged even after they are overheard by monitoring agents." *Id.* at 389, 648 A.2d at 983.  This Court's holding in *Mazzone* reveals that a plain language analysis of Cts. & Jud. Proc. § 9-105 uncovers the legislative intent to err on the side of preserving confidential marital communications as a privilege, further evidencing the liberal construction of the privilege.

Our longstanding precedent in *Coleman*, *Enriquez*, and *Mazzone* all speak to a liberal interpretation of the marital communications privilege.  The case precedent, in conjunction with the statutory authority, reveal that we have consistently provided a broad interpretation of the marital communications privilege.  I fear that the Majority's decision will erode the privilege.  Accordingly, I dissent and would affirm the judgment of the Court of Special Appeals.